1   Cindy Pánuco, Esq. [S.B. #266921]
    Brian Olney, Esq. [S.B. # 298089]
2   HADSELL STORMER & RENICK LLP
    128 N. Fair Oaks Avenue
3   Pasadena, California 91103
    Telephone: (626) 585-9600
4   Facsimile:  (626) 577-7079
    Emails: cpanuco@hadsellstormer.com
5           bolney@hadsellstormer.com
6
7   Attorneys for Plaintiffs

8

9

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| 10  AHMET DOĞAN, individually and on behalf of his deceased son FURKAN DOĞAN; and HIKMET DOĞAN, individually and on behalf of her deceased son, FURKAN DOĞAN, | Case No.: |
| | **COMPLAINT FOR DAMAGES:** |
| Plaintiffs, | 1.  Extrajudicial Killing in Violation of Torture Victim Protection Act, by Ahmet Doğan |
| vs. | 2.  Extrajudicial Killing in Violation of Torture Victim Protection Act, by Hikmet Doğan |
| EHUD BARAK, | 3.  Torture In Violation of Torture Victim Protection Act, by Ahmet Doğan and Hikmet Doğan on Behalf of Furkan Doğan as his Successors in Interest |
| Defendant. | 4.  Extrajudicial Killing in Violation of Alien Tort Claims Act, by Ahmet Doğan |
| | 5.  Extrajudicial Killing in Violation of Alien Tort Claims Act, by Hikmet Doğan |
| | 6.  Acts of International Terrorism in Violation of Anti-Terrorism Act, by Ahmet Doğan and Hikmet Doğan on Behalf of Furkan Doğan as his Successors in Interest |
| | 7.  Acts of International Terrorism in Violation of Anti-Terrorism Act, by Ahmet Doğan |
| | 8.  Acts Of International Terrorism In Violation Of Anti-Terrorism Act, by Hikmet Doğan |
| | **DEMAND FOR JURY TRIAL** |

COMPLAINT FOR DAMAGES

**INTRODUCTION**

1.      Plaintiffs institute this civil action for compensatory and punitive damages against former Israeli Minister of Defense, Ehud Barak ("Barak"), for his responsibility for violations of international and U.S. domestic law, including acts of international terrorism.

2.      On May 31, 2010, Israeli Defense Forces ("IDF") unlawfully intercepted and attacked the Gaza Freedom Flotilla, a group of six unarmed civilian vessels carrying more than 700 civilian passengers and humanitarian aid for delivery to the citizens of Gaza, while the Flotilla was sailing in international waters in the Mediterranean Sea.  The IDF's unlawful attack resulted in the extrajudicial killing of ten civilian passengers, including Furkan Doğan, an American citizen, in addition to torture, cruel inhumane or other degrading treatment, and arbitrary arrest and detention against civilian passengers on each of the vessels in the Flotilla.

3.      Plaintiffs allege that Defendant Barak participated in the planning, execution, and oversight of the IDF operation, and was responsible for ordering, aiding and abetting, and exercising command responsibility over the operation that resulted in the torture and extrajudicial killing of Furkan Doğan.  In addition, Defendant Barak failed to prevent or punish the violations of international law committed during the IDF operation and ratified the unlawful conduct. Accordingly, Plaintiffs assert that Defendant Barak is liable under domestic and international law for the extrajudicial killing and torture of Furkan Doğan.  Further, Plaintiffs allege that Defendant Barak is liable for committing acts of international terrorism in violation of U.S. law which resulted in the injury, torture, and ultimately death of an American citizen, Furkan Doğan.

4.      Plaintiffs bring this action under the Alien Tort Claims Act ("ATCA"), 18 U.S.C. § 1350; the Torture Victims Protection Act of 1991, 18 U.S.C. § 1350 note ("TVPA"); and the Anti-Terrorism Act, 18 U.S.C. §§ 2331 *et seq.* ("ATA").

**JURISDICTION AND VENUE**

5.     This Court has jurisdiction under 28 U.S.C. §§ 1331 (federal question), 1350 (Alien Tort Claims Act and Torture Victim Protection Act), and § 2333(a) (Anti-Terrorism Act).

6.     Venue is proper in the United State District Court of the Central District of California pursuant to 28 U.S.C. § 1391 (b) as "there is no district in which an action may otherwise be brought as provided in [§ 1391(b)], and the Defendant "is subject to the court's personal jurisdiction with respect to such action."  In addition, venue is proper in this district pursuant to 18 U.S.C. § 2334(a).

**PARTIES**

7.     Defendant Barak, born on February 12, 1942, is an Israeli national and currently resides in Israel.

8.     Defendant Barak held the position of Israeli Minister of Defense from June 2007 until March 18, 2013.  He thus held the position of Minister of Defense during the planning of the IDF operation against the Flotilla in the spring of 2010, during the operation on May 31, 2010, during the subsequent period in which surviving participants in the Flotilla were detained in Israel following the operation, and thereafter.

9.     As Minister of Defense, Defendant Barak was the Minister in charge of the Army on behalf of the Government and had the authority to direct the Army and IDF forces.  While serving in that position he planned and commanded the attack and interception of the Flotilla.

10.     Unless otherwise specified below, all acts and omissions alleged by Plaintiffs were carried out by Defendant Barak, other Israeli officials and directly by active or former soldiers in the IDF. Defendant Barak is responsible and liable for the common plan, design, and scheme unlawfully to attack the six vessels of the Gaza Freedom Flotilla and the civilian passengers on board which constituted acts

of international terrorism and resulted in extrajudicial killings, torture, and cruel

inhumane or other degrading treatment, in violation of customary international law.

11. Defendant Barak's position as Israeli's Minister of Defense provided

him with the ability and capacity to plan, direct, control and oversee the operation

against the Flotilla and the IDF soldiers who conducted the attack.  Therefore

Defendant Barak possessed command responsibility over the IDF forces, and knew

or should have known that the unlawful attack on the Flotilla would result in torts

and international law violations against Plaintiffs.  Defendant Barak failed to stop

the violations before and during the attack, and failed to punish those responsible

for committing the violations after the attack, thereby ratifying their conduct.

12. Furkan Doğan, aged 19, was a United States citizen born in the State

of New York.  He was tortured and killed on May 31, 2010 during the IDF attack

on the Flotilla.

13. Plaintiff Ahmet Doğan, aged 54, is a Turkish citizen and the father of

Furkan Doğan and his successor-in-interest. He brings this action individually and

on behalf of his deceased son. Plaintiff Ahmet Doğan was not a passenger on any of

the vessels of the Flotilla.  He has suffered emotional distress as a result of the

torture and killing of his son.

14. Plaintiff Hikmet Doğan, aged 50, is a Turkish citizen and the mother

of Furkan Doğan and his successor in interest. She brings this action individually

and on behalf of her deceased son. Plaintiff Hikmet Doğan was not a passenger on

any of the vessels of the Flotilla.  She has suffered emotional distress as a result of

the torture and killing of her son.

## FACTUAL ALLEGATIONS

## I.  The Existence of an Armed Conflict

15. It is widely accepted that, at all materials times of the planning stage of

the IDF operation against the Flotilla and during the attack on the Flotilla, there was

an ongoing armed conflict between Israel and Palestine/Gaza and occupation of

Palestine/Gaza.  The wider occupation and conflict between Israel and Palestine, and the continuing naval blockade (as set out below), constitute an armed conflict triggering the full protections of international humanitarian law for the Flotilla, in particular the Geneva Conventions of 1949 to which Israel is a party.

16.     The Israeli Ministry of Foreign Affairs Website stated in reference to the "Gaza flotilla and the maritime blockade of Gaza" in May 2010 that the "blockade has been imposed, as Israel is currently in a state of armed conflict with the Hamas regime" and "Maritime blockades are a legitimate and recognized measure under international law that may be implemented as part of an armed conflict at sea."  The Israeli Turkel Commission, established by the Israeli government to investigate the IDF attack on the Flotilla, observed that the Supreme Court of Israel as well as various United Nations organizations, humanitarian organizations, and human rights organizations "classify the conflict between Israel and the Hamas as an international armed conflict." In addition, the United Nation's "Report of the Secretary-General's Panel of Inquiry on the 31 May 2010 Flotilla Incident" (the "UN Palmer Report") stated that "it is implausible to deny that the nature of the armed violence between Israel and Hamas goes beyond purely domestic matters. In fact, it has all the trappings of an international armed conflict."

17.     Last, the Office of the Prosecutor of the International Criminal Court ("ICC") found during its Preliminary Examination that due to Israel's military occupation of Gaza, the conflict can be considered an international armed conflict, stating: *While Israel maintains that it is no longer occupying Gaza, the prevalent view within the international community is that Israel remains an occupying power under international law, based on the scope and degree of control that it has retained over the territory of Gaza following the 2005 disengagement. In accordance with the reasoning underlying this perspective, the Office has proceeded on the basis that the situation in Gaza can be considered within the framework of an international armed conflict in view of the continuing military*

*occupation by Israel."*

## II.     The Naval Blockade on Gaza

18.     The IDF has imposed and implemented a naval blockade on Gaza, as part of a total blockade—land, air, and sea—since early 2009.

19.     Following restrictive measures imposed by the Israeli authorities on the movement of people and goods into the Gaza strip in 2007 and 2008, a maritime closure was initiated in mid-2008 and a full naval blockade was established on January 3, 2009 and announced on January 6, 2009.  The decision to implement the blockade was ordered by the Israeli Minister of Defense in 2008—Defendant Barak—after a closure was recommended by the Military Advocate General.

20.     The announcements and advisories on the implementation of the blockade stated that "the Gaza maritime area is closed to all maritime traffic and is under blockade imposed by [the] Israeli Navy until further notice."

21.     Statements from Government and Military officials stated that the blockade was implemented due to security concerns, but also noted that previous missions by the Free Gaza Movement, a coalition of human rights activists, attempting to deliver humanitarian aid to Gaza by sea were a catalyst for the blockade.

22.     The total blockade has been widely regarded as being unlawful as a matter of international law by the UN, International Committee of the Red Cross ("ICRC"), and other international organizations.

23.     The blockade is part of the wider armed conflict between Israel and Palestine that existed at the time of the attack on the Flotilla and which continues presently (as set out above).  The events that occurred during the attack on the Flotilla and thereafter in Israel took place during this armed conflict, as has been recognized by the ICC Prosecutor when examining the allegations in respect of the attack on the Flotilla.  As noted, the civilians on the Flotilla were thus civilians caught up in an armed conflict and entitled to the full protections of international

humanitarian law, in particular the Geneva Conventions of 1949 to which Israel is a party.

### III.    The Gaza Freedom Flotilla

24.    The Gaza Freedom Flotilla was planned by the Free Gaza Movement, a human rights organization registered as a charity in Cyprus.  It has organized previous boat voyages to Gaza, along with other humanitarian organizations including the Turkish organization Foundation for Human Rights and Freedoms and Humanitarian Relief (known by its Turkish initials, "IHH"), the Swedish and Greek organizations both called Ship to Gaza, and the European Campaign to Break the Siege on Gaza.  The aims of the Flotilla were to draw international public attention to the situation in the Gaza Strip and the effect of the blockade, and to deliver humanitarian assistance and supplies to Gaza.

25.    The Flotilla consisted of six vessels at the time of the IDF's operation against the Flotilla on May, 31 2010, namely:

a)    the M.V. Mavi Marmara, a passenger ship sailing under the flag of the Union of the Comoros;

b)    the M.V. Defne Y, a cargo boat sailing under the flag of the Republic of Kiribati;

c)    the M.V. Gazze, a cargo boat sailing under the flag of the Republic of Turkey;

d)    the M.V. Sfendoni, a passenger boat sailing under the flag of Togo;

e)    the M.V. Eleftheri Mesogios, a cargo boat sailing under the flag of the Hellenic Republic of Greece; and

f)    the Challenger 1, a passenger boat sailing under the flag of the United States of America.

26.    Each vessel of the Flotilla was subject to security checks in Turkey before its final departure towards Gaza to ensure that no weapons were on board and that all members of the flotilla were unarmed.  For example, the Mavi Marmara

was subject to stringent security checks in the port of Antalya.  All items taken on board the vessel were inspected and all passengers were subjected to body searches before boarding the vessels.  When passengers were transferred from the Challenger I, similar security checks were conducted before the passengers were allowed to board.  The same security checks were conducted for all passengers and items entering the *Eleftheri Mesogios* while it was in port in Greece.  The *Sfendoni*, which was carrying passengers and medical items, was checked by the captain of the vessel to certify that there were no weapons on board.

**IV.    The planning of Israeli's operation against the Flotilla**

27.    International inquiries into the May 31, 2010 incident have found that the Government of Israel became aware in February 2010 of the plans for the Gaza Freedom Flotilla to bring humanitarian aid and supplies into Gaza.  By mid-April orders were given by high-level Government officials to begin preparing for an operation to intercept the Flotilla.  By May 12, 2010 the Government of Israel had developed a plan for the operation which was approved by the Israeli Chief of General Staff on May 13, 2010.

**V.    Defendant Barak's role in planning, ordering and directing the operation against the Flotilla**

28.    While in his position as Minister of Defense before and during the operation against the Gaza Freedom Flotilla on May 31, 2010, Defendant Barak directly participated in the planning of the IDF operation, was responsible for ordering the attack on the Gaza Freedom Flotilla, and had command responsibility over the IDF troops conducting the operation against the Flotilla and thereafter.

29.    The power of Defendant Barak to plan, order, and control the IDF operation and troops as Minister of Defense is set out in Israel's Basic Law which provides that the military, the Army, and IDF forces are "subject to the authority of the Government" and that the Minister of Defense is the "Minister in charge of the Army on behalf of the Government."  Defendant Barak had the authority as the

Minister of Defense before and on May 31, 2010 to plan, order, control, and oversee the IDF forces in their attack on the Flotilla and the events that followed.

30.   Defendant Barak was instructed by the Prime Minister to conduct "the inter-ministerial preparations and the preparations of all of the parties in the operation."  This is confirmed in the report of the Israeli Turkel Commission and in the testimony before the Commission.  For example, on August 9, 2010, Prime Minister Benjamin Netanyahu testified before the Turkel Commission stating that "I requested the Minister of Defense, to coordinate this matter, to activate the 'Forum of Seven' [the seven ministers of the inner cabinet] if necessary, and to contact me abroad, if necessary, but I wanted there to be a clear address on the ground for coordinating all of the issues, the political issues and the public relations issues, of course [h]is additional responsibility vis-à-vis the army was clear by virtue of his position as the Minister of Defense."

31.   As a result of these instructions from the Prime Minister, Defendant Barak had direct involvement in the planning of the operation, which was demonstrated by the fact that the Ministry of Defense held several meetings in April and May 2010 to prepare and plan the operation against the Flotilla.  Specifically, meetings were held at the Ministry of Defense on April 22 and May 6, 2010 to plan the operation.  It is noted in the Turkel Report that at the May 6, 2010 meeting, the Minister of Defense, Defendant Barak, "approved the overall format of the operation."  In addition, the Report of the UN Human Rights Council fact-finding mission (which investigated the attack) found that further correspondence and planning took place between the Defendant Barak as the Defense Minister, the IDF Chief of General Staff, and the Prime Minister on May 13 and 26, 2010.

32.   Defendant Barak's direct involvement in the planning and ordering of the attack on the Flotilla is disclosed through his own testimony before the Turkel Commission. He acknowledged that "The decision to halt the flotilla that was taken by me, by the Prime Minister and by the seven ministers of the inner cabinet in a

discussion on 26.05.10", which he refers to as the "political echelon." He stated that "[t]he political echelon determines what has to be done, and it bears responsibility for this," and that with regard to the Flotilla "the political echelon unanimously, aside from a marginal reservation by one of the members . . . took the decision to stop the flotilla, and in this fashion authorized the IDF to act and take over the flotilla."  The Report of the UN Human Rights Council fact-finding mission further confirmed that at the meeting of May 26, 2010 "[a] further evaluation was made . . . and the Defense Minister formally authorized the operation. Extensive training and planning was undertaken, including the setting up of a processing centre for detainees at the Port of Ashdod."

33.     In addition, Defendant Barak's direct involvement was confirmed during a press conference held by the Israeli Government in the hours after the Flotilla was attacked on May 31, 2010 in which he stated that "[t]onight the IDF gained control over the flotilla which tried to enter the Gaza beaches and break the blockade. The cabinet, the Prime Minister and I instructed the IDF to take action."

34.     Furthermore, Defendant Barak told the Turkel Commission that in making the decision to stop the Flotilla and in ordering the plan for the IDF to conduct the operation, he was advised of the consequences of extreme situations and outcomes which might result during the operation.  Defendant Barak noted that at a meeting on May 26, 2010, an intelligence picture was presented by the head of the Research Division, and a "contour of the planned action was presented by the chief of staff" which included details of the "extreme situations that could develop during the course of the incident."  Defendant Barak stated that: "*I guided the IDF to make a status evaluation with regards to examining the option of interdicting the departure of the flotilla or reducing it in terms of the means, the regions, the timing and the methods which I cannot go into detail here. In this discussion comments were made both by me and by others, with regards to examining extreme situations and extreme scenarios, and the parties responsible for the action were requested to*

*pay attention to such situations."*

## VI.     International Violations Committed during the Unlawful Attack on the Flotilla

35.     The evidence shows that an unlawful attack on civilians, constituting a violation of international law, occurred on each of the ships in the Gaza Freedom Flotilla, and that civilian passengers caught up in the attack were killed, tortured, seriously mistreated, and arbitrarily arrested and detained

36.     This evidence includes extensive first-hand testimony of passengers on board the vessels of the Flotilla, medical records, video materials, as well as the reports and findings of various international and national inquiries.

### A.     *Extrajudicial killings*

37.     The IDF operation planned and ordered by the Government of Israel, including by Defendant Barak as Defense Minister of Israel before and during the operation, resulted in the unlawful killing of ten unarmed civilian passengers including an American citizen, Furkan Doğan.  All ten decedents were killed during the IDF's attack on the vessel sailing under the flag of the Union of the Comoros, the Mavi Marmara.

38.     During the operation against the Mavi Marmara live ammunition was fired from helicopters at passengers on the top deck of the vessel before any IDF soldiers had boarded the vessel.

39.     This gunfire resulted in the injury and killing of several individuals, including Furkan Doğan who was on the top deck filming the operation when he was attacked and shot five times.  Four of the shots struck Doğan from behind, hitting his head, back, left leg, and left foot.  The fifth shot struck his face at point blank range, likely while he was lying on the ground on his back.  According to the UN Human Rights Council Report, Doğan was not killed instantly from his wounds, but rather was "lying on deck in a conscious, or semi-conscious state for some time."  International inquires and autopsy reports for the ten individuals killed

have found that five of the decedents were shot in the head at close range. Reports further found that several of the decedents were shot while attempting to video or take photographs of the IDF operation, one of whom was shot between the eyes while attempting to photograph IDF soldiers on the top deck of the Mavi Marmara.

40. The evidence and findings by international inquiries further highlight that several of those passengers killed by the IDF soldiers were killed attempting to assist other injured passengers or while they themselves were in submissive and non-threatening positions. For example, one deceased passenger was shot three times while in a crouching or bending position, including once in the back of the head, while attempting to assist an injured passenger.

41. The UN Palmer Report found that the killings resulted from the "excessive force" used by the IDF forces. In addition, the ICC Office of the Prosecutor found that "the information available indicates that there is a reasonable basis to believe that war crimes were committed on board the Mavi Marmara during the interception of the flotilla on May 31, 2010 in the context of an international armed conflict" including willful killing pursuant to article 8(2)(a)(i) of the Rome Statute.

### B. *Torture and Cruel, Inhumane and Degrading treatment*

42. The evidence demonstrates that IDF soldiers are responsible for the intentional shooting of unarmed passengers on the Mavi Marmara as well as on the other vessels of the Flotilla. In addition to the ten passengers who lost their lives, approximately 156 passengers sustained wounds as a result of the IDF gunfire, 52 of whom were reported to have suffered serious wounds. These acts constitute torture and cruel, inhumane and degrading treatment, in violation of international law norms and the law of nations.

43. Many passengers received injuries as a result of the shooting of live ammunition from the helicopters above the Mavi Marmara before IDF soldiers had boarded the ship, and subsequently from the IDF shooting at passengers on the

decks once the soldiers had boarded the vessel.  For example, one passenger who survived a gunshot wound to the back of the head heard IDF soldiers shout "this is the leader" before shooting him in the abdomen and then the back of the head.  He was further assaulted and battered by four or five IDF soldiers who thereafter bound his hands and kicked him in the face.  No medical attention was given to him as IDF soldiers stood by him for over an hour while he overheard them discussing that he was dying.

44.     Other passengers were brutally attacked, abused, and beaten by IDF soldiers even after they tried to surrender and a surrender message was transmitted on behalf of the Flotilla.  Passengers were placed in painful handcuffs and stress positions while also being kicked, beaten, and verbally harassed while bound.

45.     The UN Palmer Report found that *"[t]here was significant mistreatment of those on board the vessels in the aftermath of the take-over"* with *"[p]assengers [] detained on board the vessels and subjected to physical mistreatment and psychological abuse, including: Indiscriminate and overly-tight handcuffing of passengers, including the injured; Pushing, shoving, kicking and beating; Denial of bathroom access, including to sick and elderly; Verbal harassment and intimidation; and Prolonged and unnecessary exposure to elements on deck of Mavi Marmara."* The UN Palmer Report further found that, upon arrival in Israel, the mistreatment of passengers included being *"Pushed, shoved, kicked and beaten, with numerous cases of severe beatings at Ben Gurion airport; Subjected to verbal and physical harassment, intimidation and humiliation; Interrogated, with interrogations secretly filmed without consent"* . . . *"Forced to sign incriminating statements"* . . . *"Strip-searched or inappropriately frisked"* . . . *"subjected to sleep deprivation."*

46.     The UN Human Rights Council fact-finding mission found that this treatment was in violation of international human rights law: *"behaviour by Israeli officials which was aimed at humiliating individuals which, if not torture, would*

*constitution cruel, inhumane and degrading treatment or punishment under the terms of article 16 of the Convention against Torture.*"

47.     The ICC Office of the Prosecutor found that "there is a reasonable basis to believe that war crimes were committed on board the Mavi Marmara during the interception of the flotilla" on the basis of "wilfully causing serious injury to body and health pursuant to article 8(2)(a)(iii)" of the Rome Statute.

### C.     *Arbitrary arrest and detention*

48.     The evidence further demonstrates that passengers were arbitrarily arrested and detained in violation of their basic rights.  The passengers were denied the basic right to legal representation and access to consular services while detained in Israel.  Passengers were separated from the other passengers, left in isolation and denied the right to contact a lawyer or family.

49.     Other passengers were repeatedly interrogated, for up to five or six hours, and pressured or forced to sign a statement in Hebrew which they did not understand. Passengers were placed in prison vehicles and left without food or water.

50.     The UN Human Rights Council fact-finding mission found that "[a] large number of the military and police personnel at the airport exhibited serious and unprofessional lapses of military discipline whilst commanding officers failed in most cases to intervene promptly. Much of the behavior was surely criminal under domestic Israeli law."

## VII.   Admissions made by Defendant Barak concerning Operation against the Flotilla

51.     Defendant Barak has made public admissions that "mistakes" were made in the operation which he was responsible for planning, ordering, overseeing, and over which he exercised command responsibility.  These admissions were made in Defendant Barak's testimony before the Turkel Commission in which he acknowledged that the results of the operation against the Flotilla were not

1   satisfactory, and noted that the "mistakes" made were not rooted in the decision to
2   attack the Flotilla "but in the details of the planning or implementation" over which
3   he admitted to having decisive influence and power to control.

4       52.    A formal investigation in Israel into the decision making process
5   which led to the operation against the Flotilla concluded that this process was
6   "defective."  In addition, the findings from Israeli State Comptroller Micha
7   Lindenstrauss's investigation state that "the decision-making process in the upper
8   echelon of the state of Israel, in some of the most important matters, is not as good
9   as it could be."

10       53.    In his own testimony before the Turkel Commission, Defendant Barak
11   explicitly accepted responsibility for the events and actions which took place during
12   the attack: *As Defense Minister, I bear a comprehensive responsibility for*
13   *everything that took place in the systems subordinate to me, including the IDF. I*
14   *take full responsibility as Defense Minister, for the directives of the political*
15   *echelon, to the military echelon, as they were given also on the subject of the*
16   *flotilla."*

17       54.    Defendant Barak's admission of responsibility is further supported by
18   reports that he was in favor of issuing an apology to the Turkish Government for
19   the military or operational "mishaps" which resulted in the injury and killing of ten
20   civilians, including Plaintiff Furkan Doğan, on the Flotilla.  In addition, Barak
21   offered "to take responsibility for the Mavi Marmara incident and issue an
22   apology," a proposal which was rejected by Prime Minister Benjamin Netanyahu.

23   **VIII.   Exhaustion of and Absence of Local Remedies**

24       55.    Plaintiffs have exhausted such local and international remedies which
25   are available to them in both civil and criminal courts in that claims have either
26   been rejected and/or it is futile to commence proceedings or seek to proceed any
27   further.

28   / / /

56.     All domestic investigations conducted in Israel have been closed and failed to provide Plaintiffs with any avenue to obtain accountability and compensation for the violations.

57.     Civil claims have also been filed in the Republic of Turkey by passengers of the Flotilla, but these claims have also been dismissed.   Criminal proceedings are currently being conducted in the criminal courts of Istanbul, however the State of Israel has refused to cooperate in any way and the proceedings are being held *in absentia*.  These proceedings provide no realistic opportunity for the victims—including Furkan Doğan—to be awarded any compensation for the violations committed.

58.     In May 2013, the Government of the Comoros referred the attack on the Flotilla to the Office of the Prosecutor of the ICC as a member state of the Rome Statute for investigation.  After conducting a Preliminary Examination the Office of the Prosecutor found that although "*there is a reasonable basis to believe that war crimes were committed on board the Mavi Marmara during the interception of the flotilla on 31 May 2010 in the context of an international armed conflict, namely: (1) willful killing pursuant to article 8(2)(a)(i); (2) wilfully causing serious injury to body and health pursuant to article 8(2)(a)(iii); and (3) committing outrages upon personal dignity pursuant to article 8(2)(b)(xxi) of the Statute*", the Office of the Prosecutor declined to open a formal investigation.  This decision is currently being reviewed and considered by the Appeals Chamber of the ICC.

/ / /

/ / /

/ / /

1
2
3
4
5

## CLAIMS FOR RELIEF

### First Claim for Relief

### Extrajudicial Killing under the TVPA

### (Plaintiff Ahmet Doğan in his individual capacity)

### (Against Defendant Ehud Barak)

6  59.  Plaintiff Ahmet Doğan re-alleges and incorporates by reference the

7  allegations set forth in paragraphs 1 through 58 as if fully set forth herein.

8  60.  The killing of Furkan Doğan constitutes an extrajudicial killing as

9  defined by the Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat. 73

10  (1992) (codified at 28 U.S.C. § 1350 note).

11  61.  The killing of Furkan Doğan was not authorized by any court

12  judgment. Furkan Doğan was never charged with, convicted of, nor sentenced for

13  any crime.

14  62.  Defendant Barak ordered, directed, procured, planned, organized,

15  and/or aided and abetted others in effecting the common plan, design, and scheme

16  that resulted in the murder of Furkan Doğan.  The extrajudicial killing of Furkan

17  Doğan was committed under actual or apparent authority, or color of law, of the

18  Israeli Ministry of Defense and the Government of the State of Israel.

19  63.  In addition, Defendant Barak directed, oversaw and ordered the IDF

20  operation and exercised command responsibility over the IDF's actions.  Defendant

21  Barak knew or should have known that his subordinates—the IDF troops for which

22  he had command responsibility over—had committed, were committing, or were

23  about to commit human rights abuses including extrajudicial killing.  Defendant

24  Barak failed to prevent the abuses or to punish those responsible, thereby ratifying

25  their conduct.

26  64.  As a result of the unlawful killing of his son, Ahmet Doğan suffered

27  emotional damages.

28  / / /

65.     The acts and omissions of Defendant Barak was deliberate, willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages in an amount to be determined at trial.

### Second Claim for Relief

### Extrajudicial Killing under the TVPA

### (Plaintiff Hikmet Doğan in her individual capacity)

### (Against Defendant Ehud Barak)

66.     Plaintiff Hikmet Doğan re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 58 as if fully set forth herein.

67.     The killing of Furkan Doğan constitutes an extrajudicial killing as defined by the Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note).

68.     The killing of Furkan Doğan was not authorized by any court judgment. Furkan Doğan was never charged with, convicted of, nor sentenced for any crime.

69.     Defendant Barak ordered, directed, procured, planned, organized, and/or aided and abetted others in effecting the common plan, design, and scheme that resulted in the murder of Furkan Doğan.  The extrajudicial killing of Furkan Doğan was committed under actual or apparent authority, or color of law, of the Israeli Ministry of Defense and the Government of the State of Israel.

70.     In addition, Defendant Barak directed, oversaw and ordered the IDF operation and exercised command responsibility over the IDF's actions.  Defendant Barak knew or should have known that his subordinates—the IDF troops for which he had command responsibility over—had committed, were committing, or were about to commit human rights abuses including extrajudicial killing.  Defendant Barak failed to prevent the abuses or to punish those responsible, thereby ratifying their conduct.

/ / /

71.     As a result of the unlawful killing of her son, Hikmet Doğan suffered emotional damages.

72.     The acts and omissions of Defendant Barak was deliberate, willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages in an amount to be determined at trial.

### Third Claim for Relief

### Torture under the TVPA

### (Plaintiffs Ahmet Doğan and Hikmet Doğan on behalf of Furkan Doğan as his successors in interest)

### (Against Defendant Ehud Barak)

73.     Plaintiffs Ahmet Doğan and Hikmet Doğan, on behalf of Furkan Doğan as his successors in interest, re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 58 as if fully set forth herein.

74.     The acts committed against Furkan Doğan before he died as described herein constitute torture as defined by the Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note).

75.     The acts described herein were inflicted deliberately and intentionally upon Furkan Doğan for purposes that include, among others, intimidating and discriminating against Furkan Doğan and others, punishing him and the passengers of the Flotilla for their involvement in challenging the naval blockade of Gaza, and as a form of collective punishment against those living in Gaza and extended to the Plaintiff and others who sought to highlight the plight of those in Gaza and deliver humanitarian aid.  The acts described herein, including the attack against and shooting of Furkan Doğan, placed him in imminent fear for his life and caused him to suffer severe physical and mental pain and suffering in the time between when he was first attacked and shot five times until his death.

76.     The acts inflicted against the Plaintiff were inflicted at the instigation, under the control or authority, or with the consent or acquiescence of a public

1  official or other person acting in an official capacity, and were committed under
2  actual or apparent authority, or color of law, of the Israeli Ministry of Defense and
3  the Government of the State of Israel.

4      77.    The torture of Furkan Doğan did not arise from, and was not inherent
5  in or incidental to, lawful sanctions.

6      78.    Defendant Barak planned, instigated, ordered, and authorized the IDF
7  troops to commit the abuses suffered by Furkan Doğan, and had command or
8  superior responsibility over and controlled such forces in their commission of such
9  abuses.  Defendant Barak knew or should have known that his subordinates had
10  committed, were committing, or were about to commit human rights abuses,
11  including the shooting and torture suffered by Furkan Doğan, and he failed to
12  prevent the abuses or to punish those responsible, thereby ratifying their conduct.

13      79.    As a result of the torture described above, Ahmet Doğan, on behalf of
14  Furkan Doğan as his successor in interest, was damaged, including but no limited to
15  emotional damage, and is entitled to compensation in amounts to be determined at
16  trial.

17      80.    Defendant Barak's acts and omissions were deliberate, willful,
18  intentional, wanton, malicious and oppressive, and should be punished by an award
19  of punitive damages in an amount to be determined at trial.

### Fourth Claim for Relief

### Extrajudicial Killing under the ATS

### (Plaintiff Ahmet Doğan in his individual capacity)

### (Against Defendant Ehud Barak)

24      81.    Plaintiff Ahmet Doğan re-alleges and incorporates by reference the
25  allegations set forth in paragraphs 1 through 58 as if fully set forth herein.

26      82.    The extrajudicial killing of Furkan Doğan constitutes a "tort . . .
27  committed in violation of the law of nations or a treaty of the United States" under
28  the Alien Tort Claims Act, 28 U.S.C. § 1350, in that the acts against Plaintiff

Ahmet Doğan's son, Furkan Doğan, violated customary international law prohibiting extrajudicial killing and torture, and defined in multilateral treaties and other international instruments, decisions of national and international judicial bodies, and other authorities.  These include the following:

a)   Customary International Law;

b)   United Nations Charter, 59 Stat. 1031, 3 Bevans 1153 (1945);

c)   Universal Declaration of Human Rights, G.A. res. 217A(iii), U.N. Doc. A/810 (1948);

d)   Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287 [Fourth Geneva Convention];

e)   Common Article 3 of the four Geneva Conventions;

f)   1977 Protocol Additional to the Geneva Convention of 12 August 1949, and Relating to the Protection of Victims of International Armed Conflicts (Protocol I); 1977 Protocol Additional to the Geneva Convention of 12 August 1949, and Relating to the Protection of Victims of Non International Armed Conflicts (Protocol II), entered into force, Dec. 7, 1978. U.N. Doc. A/32/144, Annex II (1977), reprinted in 16 I.L.M. 1442 (1977);

g)   United Nations Standard Minimum Rules for the Treatment of Prisoners, U.N. Doc. A/CONF/611, ANNEX I, ESC Res. 663(c), 24 U.N. ESCOR Supp. (No. 1) at 11, U.N. Doc E/3048 (1957), amended E.S.C. Res. 2076, 62 U.N. ESCOR Supp. (No. 1), at 35, U.N. Doc. E/5988 (1977);

h)   The Rome Statute of the International Criminal Court, U.N. Doc. A/CONF. 183/9, adopted by the United Nations Diplomatic Conference of Plenipotentiaries on the Establishment of an International Criminal Court on 17 July 1998;

i)      International Covenant on Civil and Political Rights, G.A. Res. 2220A (xxi), 21 U.N. Doc., GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966);

j)      The Charter of the International Military Tribunal, Nuremberg, of 8 August 1945 and confirmed by resolutions 3(I) of 13 February 1946 and 95 (I) of 11 December 1946 of the General Assembly of the United Nations; and

k)      The Convention on the Non-Applicability of Statutory Limitations to War Crimes and Crimes Against Humanity, G.A. res. 2391 (XXIII), annex, 23 U.N. GAOR Supp. (No. 18) at 40, U.N. Doc. A/7218 (1968).

83.      The acts inflicted against Furkan Doğan were inflicted by and/or at the instigation, under the control or authority, or with the consent or acquiescence of Defendant Barak in his official capacity as Minister of Defense.

84.      Defendant Barak planned, directed, and ordered the IDF operation and exercised command responsibility over the IDF's actions of killing Furkan Doğan. Furthermore, in exercising command responsibility Defendant Barak knew or should have known that his subordinates—the IDF troops for which he had command responsibility over—had committed, were committing, or were about to commit human rights abuses which resulted in the intentional infliction of emotional distress on the Plaintiff.  Defendant Barak failed to prevent the abuses or to punish those responsible, thereby ratifying the unlawful conduct.

85.      As a result of the acts described above, Plaintiff Ahmet Doğan has been damaged, including suffering emotional damage, and is entitled to compensation in amounts to be determined at trial.

86.      Defendant Barak's acts and omissions were deliberate, willful, intentional, wanton, malicious and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

COMPLAINT FOR DAMAGES      -21-

**Fifth Claim for Relief**

**Extrajudicial Killing under the ATS**

**(Plaintiff Hikmet Doğan in her individual capacity)**

**(Against Defendant Ehud Barak)**

87.     Plaintiff Hikmet Dogan re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 58 as if fully set forth herein.

88.     The extrajudicial killing of Furkan Doğan constitutes a "tort . . . committed in violation of the law of nations or a treaty of the United States" under the Alien Tort Claims Act, 28 U.S.C. § 1350, in that the acts against Plaintiff Hikmet Doğan's son, Furkan Doğan, violated customary international law prohibiting extrajudicial killing and torture, and defined in multilateral treaties and other international instruments, decisions of national and international judicial bodies, and other authorities.  These include the following:

a)     Customary International Law;

b)     United Nations Charter, 59 Stat. 1031, 3 Bevans 1153 (1945);

c)     Universal Declaration of Human Rights, G.A. res. 217A(iii), U.N. Doc. A/810 (1948);

d)     Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287 [Fourth Geneva Convention];

e)     Common Article 3 of the four Geneva Conventions;

f)     1977 Protocol Additional to the Geneva Convention of 12 August 1949, and Relating to the Protection of Victims of International Armed Conflicts (Protocol I); 1977 Protocol Additional to the Geneva Convention of 12 August 1949, and Relating to the Protection of Victims of Non International Armed Conflicts (Protocol II), entered into force, Dec. 7, 1978. U.N. Doc. A/32/144, Annex II (1977), reprinted in 16 I.L.M. 1442 (1977);

g)      United Nations Standard Minimum Rules for the Treatment of
        Prisoners, U.N. Doc. A/CONF/611, ANNEX I, ESC Res. 663(c), 24
        U.N. ESCOR Supp. (No. 1) at 11, U.N. Doc E/3048 (1957), amended
        E.S.C. Res. 2076, 62 U.N. ESCOR Supp. (No. 1), at 35, U.N. Doc.
        E/5988 (1977);

h)      The Rome Statute of the International Criminal Court, U.N. Doc.
        A/CONF. 183/9, adopted by the United Nations Diplomatic
        Conference of Plenipotentiaries on the Establishment of an
        International Criminal Court on 17 July 1998;

i)      International Covenant on Civil and Political Rights, G.A. Res. 2220A
        (xxi), 21 U.N. Doc., GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316
        (1966);

j)      The Charter of the International Military Tribunal, Nuremberg, of 8
        August 1945 and confirmed by resolutions 3(I) of 13 February 1946
        and 95 (I) of 11 December 1946 of the General Assembly of the
        United Nations; and

k)      The Convention on the Non-Applicability of Statutory Limitations to
        War Crimes and Crimes Against Humanity, G.A. res. 2391 (XXIII),
        annex, 23 U.N. GAOR Supp. (No. 18) at 40, U.N. Doc. A/7218
        (1968).

89.     The acts inflicted against Furkan Doğan were inflicted by and/or at the
instigation, under the control or authority, or with the consent or acquiescence of
Defendant Barak in his official capacity as Minister of Defense.

90.     Defendant Barak planned, directed, and ordered the IDF operation and
exercised command responsibility over the IDF's actions of killing Furkan Doğan.
Furthermore, in exercising command responsibility Defendant Barak knew or
should have known that his subordinates—the IDF troops for which he had
command responsibility over—had committed, were committing, or were about to

commit human rights abuses which resulted in the intentional infliction of emotional distress on the Plaintiff.  Defendant Barak failed to prevent the abuses or to punish those responsible, thereby ratifying the unlawful conduct.

91.    As a result of the acts described above, Plaintiff Hikmet Doğan has been damaged, including suffering emotional damage, and is entitled to compensation in amounts to be determined at trial.

92.    Defendant Barak's acts and omissions were deliberate, willful, intentional, wanton, malicious and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

## Sixth Claim for Relief

**Committing Acts of International Terrorism in Violation of 18 U.S.C. §2333 (Plaintiffs Ahmet Doğan and Hikmet Doğan, on behalf of Furkan Doğan as his successors in interest)**

**(Against Defendant Ehud Barak)**

93.    Plaintiffs Ahmet Doğan and Hikmet Doğan re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 58 as if fully set forth herein.

94.    Defendant Barak's acts of planning, directing, ordering, aiding and abetting, and exercising command responsibility over, the IDF attack on the civilian passengers of the Gaza Freedom Flotilla constitute acts of international terrorism as defined by 18 U.S.C. § 2331 as they resulted in "violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State" and "would be a criminal violation if committed within the jurisdiction of the United States or of any State."  Defendant Barak's acts, which occurred outside the jurisdiction of the United States, were intended to "intimidate or coerce a civilian population" within the meaning of 18 U.S.C. § 2331, specifically the civilian passengers of the Flotilla in addition to the civilian population of Gaza.

/ / /

95.    The role Defendant Barak played in preparing, ordering, overseeing and facilitating these acts of international terrorism amounts to acts of international terrorism in violation of 18 U.S.C. § 2333 that have caused injuries to Furkan Doğan.

96.    Defendant's acts were dangerous to human life, by their nature and as evidenced by their consequences; particularly the torture and death of an American citizen, Furkan Doğan.

97.    Defendant Barak's acts occurred outside the territorial jurisdiction of the United States or transcended national boundaries in terms of the means by which they were accomplished. The planning and ordering of the attack occurred within the State of Israeli and on the high seas, and the attack itself and subsequent events, which Defendant Barak directed, oversaw, aided and abetted, and for which he had command responsibility, occurred in international waters and thereafter in Israel when civilian passengers were detained and brought to Israel for interrogation.

98.    Accordingly, Defendant Barak's acts constitute acts of international terrorism as defined by 18 U.S.C. §§ 2331 and 2333.

99.    Defendant Barak directed, ordered, oversaw and aided and abetted the IDF operation and exercised command responsibility over the acts of international terrorism, and knew or should have known that his subordinates—the IDF troops over which he had command responsibility—had committed, were committing, or were about to commit acts of international terrorism which he failed to prevent or punish.  Accordingly, Defendant Barak's acts constitute planning, ordering, and aiding and abetting acts of international terrorism which resulted in the torture and death of an American citizen, Furkan Doğan.

100.   Defendant Barak not only directly planned and ordered the international acts of terrorism, but knowingly provided substantial assistance to acts of international terrorism and accordingly, the acts constitute aiding and abetting

1   acts of international terrorism.

2       101.   Defendant Barak also agreed to combine with other persons to act

3   unlawfully in the manner set forth above and committed overt acts in furtherance of

4   the conspiracy.

5       102.   At all relevant times, Defendant knew of the conspiracy and knew, and

6   knows, in particular, that the acts planned and ordered would constitute acts of

7   international terrorism.

8       103.   For the reasons set forth above, Defendant Barak is civilly liable for

9   damages, by reason of the acts of international terrorism, to Ahmet Doğan and

10   Hikmet Doğan on behalf of Furkan Doğan as his successors in interest for the

11   injuries and torture Furkan suffered before his death, pursuant to 18 U.S.C. § 2333.

12   **Seventh Claim for Relief**

13   **Committing Acts of International Terrorism in Violation of 18 U.S.C. §2333**

14   **(Plaintiff Ahmet Doğan in his individual capacity)**

15   **(Against Defendant Ehud Barak)**

16       104.   Plaintiff Ahmet Doğan re-alleges and incorporates by reference the

17   allegations set forth in paragraphs 1 through 58 as if fully set forth herein.

18       105.   Defendant Barak's acts of planning, directing, ordering, aiding and

19   abetting, and exercising command responsibility over, the IDF attack on the civilian

20   passengers of the Gaza Freedom Flotilla constitute acts of international terrorism as

21   defined by 18 U.S.C. § 2331 as they resulted in "violent acts or acts dangerous to

22   human life that are a violation of the criminal laws of the United States or of any

23   State" and "would be a criminal violation if committed within the jurisdiction of the

24   United States or of any State."  Defendant Barak's acts, which occurred outside the

25   jurisdiction of the United States, were intended to "intimidate or coerce a civilian

26   population" within the meaning of 18 U.S.C. § 2331, specifically the civilian

27   passengers of the Flotilla in addition to the civilian population of Gaza.

28   / / /

106.   The role Defendant Barak played in preparing, ordering, overseeing and facilitating these acts of international terrorism amounts to acts of international terrorism in violation of 18 U.S.C. § 2333 that have caused injuries to Ahmet Doğan.

107.   Defendant's acts were dangerous to human life, by their nature and as evidenced by their consequences; particularly the torture and death of an American citizen, Furkan Doğan.

108.   Defendant Barak's acts occurred outside the territorial jurisdiction of the United States or transcended national boundaries in terms of the means by which they were accomplished. The planning and ordering of the attack occurred within the State of Israeli and on the high seas, and the attack itself and subsequent events, which Defendant Barak directed, oversaw, aided and abetted, and for which he had command responsibility, occurred in international waters and thereafter in Israel when civilian passengers were detained and brought to Israel for interrogation.

109.   Accordingly, Defendant Barak's acts constitute acts of international terrorism as defined by 18 U.S.C. §§ 2331 and 2333.

110.   Defendant Barak directed, ordered, oversaw and aided and abetted the IDF operation and exercised command responsibility over the acts of international terrorism, and knew or should have known that his subordinates—the IDF troops over which he had command responsibility—had committed, were committing, or were about to commit acts of international terrorism which he failed to prevent or punish.  Accordingly, Defendant Barak's acts constitute planning, ordering, and aiding and abetting acts of international terrorism which resulted in the torture and death of an American citizen, Furkan Doğan.

111.   Defendant Barak not only directly planned and ordered the international acts of terrorism, but knowingly provided substantial assistance to acts of international terrorism and accordingly, the acts constitute aiding and abetting

1   acts of international terrorism.

2   112.   Defendant Barak also agreed to combine with other persons to act

3   unlawfully in the manner set forth above and committed overt acts in furtherance of

4   the conspiracy.

5   113.   At all relevant times, Defendant knew of the conspiracy and knew, and

6   knows, in particular, that the acts planned and ordered would constitute acts of

7   international terrorism.

8   114.   For the reasons set forth above, Defendant Barak is civilly liable for

9   damages, including emotional damages, by reason of the acts of international

10   terrorism, to Ahmet Doğan for Furkan's death by extrajudicial killing, pursuant to

11   18 U.S.C. § 2333.

12   ## Eighth Claim for Relief

13   **Committing Acts of International Terrorism in Violation of 18 U.S.C. §2333**

14   **(Plaintiff Hikmet Doğan in her individual capacity)**

15   **(Against Defendant Ehud Barak)**

16   115.   Plaintiff Hikmet Doğan re-alleges and incorporates by reference the

17   allegations set forth in paragraphs 1 through 58 as if fully set forth herein.

18   116.   Defendant Barak's acts of planning, directing, ordering, aiding and

19   abetting, and exercising command responsibility over, the IDF attack on the civilian

20   passengers of the Gaza Freedom Flotilla constitute acts of international terrorism as

21   defined by 18 U.S.C. § 2331 as they resulted in "violent acts or acts dangerous to

22   human life that are a violation of the criminal laws of the United States or of any

23   State" and "would be a criminal violation if committed within the jurisdiction of the

24   United States or of any State."  Defendant Barak's acts, which occurred outside the

25   jurisdiction of the United States, were intended to "intimidate or coerce a civilian

26   population" within the meaning of 18 U.S.C. § 2331, specifically the civilian

27   passengers of the Flotilla in addition to the civilian population of Gaza.

28   / / /

117.   The role Defendant Barak played in preparing, ordering, overseeing and facilitating these acts of international terrorism amounts to acts of international terrorism in violation of 18 U.S.C. § 2333 that have caused injuries to Hikmet Doğan .

118.   Defendant's acts were dangerous to human life, by their nature and as evidenced by their consequences; particularly the torture and death of an American citizen, Furkan Doğan.

119.   Defendant Barak's acts occurred outside the territorial jurisdiction of the United States or transcended national boundaries in terms of the means by which they were accomplished. The planning and ordering of the attack occurred within the State of Israel and on the high seas, and the attack itself and subsequent events, which Defendant Barak directed, oversaw, aided and abetted, and for which he had command responsibility, occurred in international waters and thereafter in Israel when civilian passengers were detained and brought to Israel for interrogation.

120.   Accordingly, Defendant Barak's acts constitute acts of international terrorism as defined by 18 U.S.C. §§ 2331 and 2333.

121.   Defendant Barak directed, ordered, oversaw and aided and abetted the IDF operation and exercised command responsibility over the acts of international terrorism, and knew or should have known that his subordinates—the IDF troops over which he had command responsibility—had committed, were committing, or were about to commit acts of international terrorism which he failed to prevent or punish.  Accordingly, Defendant Barak's acts constitute planning, ordering, and aiding and abetting acts of international terrorism which resulted in the torture and death of an American citizen, Furkan Doğan.

122.   Defendant Barak not only directly planned and ordered the international acts of terrorism, but knowingly provided substantial assistance to acts of international terrorism and accordingly, the acts constitute aiding and abetting

1  acts of international terrorism.

2      123.  Defendant Barak also agreed to combine with other persons to act

3  unlawfully in the manner set forth above and committed overt acts in furtherance of

4  the conspiracy.

5      124.  At all relevant times, Defendants knew of the conspiracy and knew,

6  and knows, in particular, that the acts planned and ordered would constitute acts of

7  international terrorism.

8      125.  For the reasons set forth above, Defendant Barak is civilly liable for

9  damages, including emotional damages, by reason of the acts of international

10  terrorism, to Hikmet Doğan for Furkan's death by extrajudicial killing, pursuant to

11  18 U.S.C. § 2333.

12                          **PRAYER FOR RELIEF**

13      WHEREFORE, Plaintiffs, pray for judgment against the Defendant as

14  follows:

15      1.      For compensatory damages according to proof;

16      2.      For punitive and exemplary damages according to proof;

17      3.      For reasonable attorneys' fees and costs of suit, according proof, and

18      4.      For such other and further relief as the court may deem just and

19  proper.

20                        **DEMAND FOR JURY TRIAL**

21      Plaintiffs hereby demand trial by jury on all issues in this action.

22

23  Dated: October 16, 2015          Respectfully Submitted,

24                                    HADSELL STORMER & RENICK LLP

25

26                                    By: __/s/ - Cindy Pánuco_____
                                          Cindy Pánuco
27                                        Brian Olney
                                          Attorneys for Plaintiffs
28

_____
COMPLAINT FOR DAMAGES          -30-