Dan Stormer, Esq. [S.B. #101967]
Cindy Pánuco, Esq. [S.B. #266921]
Mary Tanagho Ross, Esq. [S.B. #280657]
Brian Olney, Esq. [S.B. # 298089]
HADSELL STORMER & RENICK LLP
128 N. Fair Oaks Avenue
Pasadena, California 91103
Telephone: (626) 585-9600
Facsimile:  (626) 577-7079
Emails: dstormer@hadsellstormer.com
         cpanuco@hadsellstormer.com
         mross@hadsellstormer.com
         bolney@hadsellstormer.com

Haydee J. Dijkstal (*Pro Hac Vice*)
Care of: Stoke and White LLP
150 Minories
London, United Kingdom, EC3N 1LS
Email: haydee@stokewhite.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AHMET DOĞAN, individually and on behalf of his deceased son FURKAN DOĞAN; and HIKMET DOĞAN, individually and on behalf of her deceased son, FURKAN DOĞAN,<br><br>Plaintiffs,<br><br>vs.<br><br>EHUD BARAK,<br><br>Defendant. | Case No.: CV 15-08130-ODW (GJSx)<br><br>[Assigned to the Honorable Otis D. Wright, II – Courtroom 11]<br><br>**PLAINTIFFS' SUPPLEMENTAL BRIEF RE U.S. GOVERNMENT'S SUGGESTION OF IMMUNITY**<br><br>DATE:      July 25, 2016<br>TIME:      1:30 p.m.<br>CRTRM:   11<br><br>Complaint filed:      October 16, 2015<br>Discovery Cut-Off:   None Set<br>Motion Cut-Off:      None Set<br>Trial Date:          None Set |

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ................................................................................... iii

I.   INTRODUCTION ...................................................................................... 1

II.  ARGUMENT ............................................................................................ 2

A.   The Executive's Attempt to Bind this Court Offends the
     Separation of Powers ...................................................................... 2

     1.   The Constitution Does Not Provide the Executive Exclusive
          Authority Over Foreign Affairs ............................................. 3

     2.   The Supreme Court Has Rejected Absolute Deference to the
          Executive's Views Over Foreign Affairs to Avoid Politicizing
          the Judiciary and Corrupting Its Decisions ........................... 4

     3.   The Specific Constitutional Power to "receive ambassadors and
          other public ministers," and Not the More Limited General Power
          Over Foreign Affairs, Governs the Cases the Executive Cites As
          Examples of Absolute Judicial Deference .............................. 6

     4.   The Ninth Circuit Has Never Granted Absolute Deference
          to the Executive Branch's Views Regarding Foreign Official
          Immunity ................................................................................ 4

     5.   The Ninth Circuit Consistently Rejects Absolute Deference
          to the Executive's Views Over Foreign Policy Matters ......... 5

     6.   The Suggestion of Immunity In This Case Is Entitled
          to Little Weight ...................................................................... 6

B.   Under Youngstown, the Executive Has Only Limited Power Over
     Foreign Official Immunity ............................................................. 15

     1.   Immunity Determinations For Foreign Officials Do Not Fall
          within *Youngstown* Category I ............................................. 16

     2.   Immunity Determinations For Foreign Officials Do Not Fall
          within *Youngstown* Category II ........................................... 16

3.      Conduct Immunity Determinations Fall within *Youngstown*
        Category III ............................................... 19

C.   Because the Executive's Suggestion of Immunity for the Torture
     and Execution of Furkan Do?an Is Not Reasonable, this Court
     Should Reject It ............................................... 21

III.   CONCLUSION ............................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Alperin v. Vatican Bank*
410 F.3d 532 (9th Cir. 2005)................................................................13

*Berger v. United States*
295 U.S. 78 (1935) ............................................................................11

*Berizzi Brothers Co. v. The Pesaro*
271 U.S. 562 (1926) ............................................................................9

*Butz v. Economou*
438 U.S. 478 (1978) ..........................................................................24

*Chuidian v. Philippine National Bank*
912 F.2d 1095  (9th Cir. 1990)................................................8, 12, 23

*City of Milwaukee v. Illinois & Michigan*
451 U.S. 304 (1981) ..........................................................................24

*Doe I v. Liu Qi*
349 F.Supp.2d 1258 (N.D. Cal. 2004) ............................................13, 14

*Doe v. De Leon*
555 F. App'x 84, 85  (2d Cir. 2014) ....................................................18

*Doe v. Exxon Mobil Corp.*
473 F.3d 345 (D.C. Cir. 2007) ............................................................4

*El Al Isr. Airlines v. Tsui Yuan Tseng*
525 U.S. 155 (1999) ............................................................................4

*In re Estate of Marcos Human Rights Litigation*
978 F.2d 493 (9th Cir. 1992)..........................................................15, 21

*Filártiga v. Peña-Irala*
630 F.2d 876 (2d Cir. 1980) ..............................................................18

*First National City Bank v. Banco Nacional de Cuba*
    406 U.S. 759 (1972) ..............................................................................4

*Giraldo v. Drummond Co.*
    493 F. App'x 106 (D.C. Cir. 2012)......................................................18

*Giraldo v. Drummond Co.*
    No. 1:10-mc-00764-JDB (D.D.C. Mar. 31, 2011)................................14

*Greenspan v. Crosbie*
    74 Civ. 4734  1976 U.S.Dist. LEXIS 12155  (S.D.N.Y. Nov. 23, 1976) .................17

*Habyarimana v. Kagame*
    696 F.3d 1029 (10th Cir. 2012)...........................................................10

*Hassen v. Nahyan*
    *No. CV 09-01106 DMG* (MANx),
    2010 U.S.Dist. LEXIS 144819 (C.D. Cal. Sep. 17, 2010)...........12, 18, 23

*Heaney v. Government of Spain*
    445 F.2d 501 (2d Cir. 1971)..............................................................6, 9

*Hilao v. Marcos*
    25 F.3d 1467 (9th Cir. 1994).................................................................21

*Isbrandtsen Tankers v. President of India*
    446 F.2d 1198  (2d Cir. 1971).........................................................8, 24

*Khulumani v. Barclay National Bank Ltd.*
    504 F.3d 254  (2d Cir. 2007)...............................................................4

*Libya Velidor v. L/P/G Benghazi*
    653 F.2d 812 (3d Cir. 1981).................................................................9

*Marbury v. Madison*
    5 U.S. 137, 177 (1803) ......................................................................14

*Matar v. Dichter*
    563 F.3d 9 (2d Cir. 2009)..............................................................18, 22

*Medellin v. Texas*
 552 U.S. 491 (2008) ..................................................................................3, 15, 16

*Mireskandari v. Mayne*
 No. 12- cv-3861-JGB-MRWx,
 2016 U.S.Dist. LEXIS 38944  (C.D. Cal. Mar. 23, 2016) ..................................18, 22

*Mujica v. Airscan*
 771 F.3d 580 (9th Cir. 2014)....................................................................13

*Peterson v. Islamic Republic of Iran*
 627 F.3d 1117 (9th Cir. 2010)....................................................................11

*Republic of Aus. v. Altmann*
 541 U.S. 677 (2004) ..................................................................... *passim*

*Republic of Mexico v. Hoffman*
 324 U.S. 30 (1945) ............................................................................6, 8

*Ex parte Republic of Peru*
 318 U.S. 578 (1943) .........................................................................6, 8, 11

*Republic of Philippines by Central Bank of Philippines v. Marcos*
 65 F.Supp.793 (N.D. Cal. 1987) ...................................................................18

*Rich v. Naviera Vacuba S. A.*
 295 F.2d 24 (4th Cir. 1961).......................................................................8

*Rosenberg v. Pasha*
 577 F. App'x 22, 23-24  (2d Cir. 2014)..............................................................18

*S.E. Leasing Corp. v. Stern Dragger Belogorsk*
 493 F.2d 1223 (1st Cir. 1974) .....................................................................8

*Samantar v. Yousuf*
 560 U.S. 305 (2010) ..................................................................... *passim*

*Sarei v. Rio Tinto*
 487 F.3d 1193 (9th Cir. 2007)....................................................................13

*Siderman de Blake v. Republic of Argentina*
    965 F.2d 699 (9th Cir. 1992)...........................................................................11, 12

*Sosa v. Alvarez-Machain*
    542 U.S. 692 (2004) ...........................................................................................4

*Spacil v. Crowe*
    489 F.2d 614 (5th Cir. 1974)...........................................................................8, 20

*The Schooner Exchange v. McFaddon*
    11 U.S. 116 (1812) ....................................................................................5, 17, 23

*Trajano v. Marcos*
    978 F.2d 493 (9th Cir. 1992)...................................................................21, 22, 24

*United States v. Belfast*
    611 F.3d 783 (11th Cir. 2010)..........................................................................12, 15

*United States v. Curtiss-Wright Export Corp.*
    299 U.S. 304 (1936) ...........................................................................................3

*United States v. Emmanuel*
    No. 06-20758-CR (S.D. Fla. July 5, 2007) .............................................................15

*Verlinden B.V. v. Central Bank of Nigeria*
    461 U.S. 480 (1983) ................................................................................ *passim*

*Waltier v. Thomson*
    189 F.Supp. 319 (S.D.N.Y. 1960).....................................................................6, 9

*Warfaa v. Ali*
    811 F.3d 653, 2016 U.S.App. LEXIS 1670 (4th Cir. Feb. 1, 2016) ........................18

*Ye v. Zemin*
    383 F.3d 620 (2004) .........................................................................................10

*Youngstown Sheet & Tube Co. v. Sawyer*
    343 U.S. 579 (1952) ................................................................................ *passim*

*Yousuf v. Samantar*
    699 F.3d 763 (4th Cir. 2012) ................................................................... *passim*

*Zivotofsky v. Kerry*
    135 S.Ct. 2076 (2015) ...................................................................... *passim*

## FEDERAL STATUTES

18 U.S.C.
    § 2333 ...................................................................................23
    §§ 2340-2340A ......................................................................23
    § 2441 ...................................................................................23

28 U.S.C.
    § 1350 ...................................................................................23
    § 1605(a) ..............................................................................23
    § 1605(b) ................................................................................8
    § 1605A ...............................................................................18
    § 1609 .....................................................................................8

U.S. Const. Art. II
    § 3 ...............................................................................7, 9, 10

## MISCELLANEOUS

Beth Stephens, *The Modern Common Law of Foreign Official Immunity*,
    79 FORDHAM L.REV. 2669 (2011) ........................................22

*Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*,
    S. Exec. Rep. 101-30 (1990) ...............................................12

H. R. Rep. No. 94-1487 (1976) .....................................................20

Ingrid Wuerth, *Foreign Official Immunity Determinations in U.S. Courts*,
    51 VA. J. INT'L L. 915 (2011) ..............................................21

S. Rep. No. 102-249 (1991) ..........................................................24

*To Define the Jurisdiction of U.S. Courts in Suits Against Foreign States: Hearing on H.R. 11315 Before the Subcomm. on Admin. Law & Governmental Relations of the H. Comm. on the Judiciary*,
    94th Cong. 34 (1976).........................................................19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

VIENNA CONVENTION ON CONSULAR RELATIONS
    Apr. 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261..........................................................9

VIENNA CONVENTION ON DIPLOMATIC RELATIONS
    APR. 18, 1961, 23 U.S.T. 3227, 500 U.N.T.S. 95......................................................9

# I.    INTRODUCTION

This case concerns the torture and unlawful killing of a 19 year-old U.S. citizen, Furkan Doğan, while volunteering on a humanitarian mission prior to commencing his studies at medical school. On May 31, 2010, IDF soldiers boarded the *Mavi Marmara*, an unarmed civilian ship attempting to deliver humanitarian supplies to the people of Gaza. The commandos opened fire on Furkan, who was armed only with a video camera, shooting him four times from behind. They then approached Furkan as he lay on the deck in great pain, kicked him, and fired a shotgun at point blank range into his face. On October 16, 2015, Furkan's parents, Plaintiffs Ahmet and Hikmet Doğan, commenced this action, seeking to hold Defendant Ehud Barak individually liable for commanding the attack resulting in the horrific torture and murder of their son.

On June 10, 2016, the U.S. Department of Justice filed a Suggestion of Immunity (SOI) on behalf of the U.S. State Department, asserting its belief that Defendant is immune from suit and demanding that the Court acquiesce to its view. (Docket No. 48.) This Court should do no such thing. The Executive's flailing attempt to strip this Court of jurisdiction offends the separation of powers and is foreclosed by basic constitutional principles. Nor is the Executive empowered by any implied or express act of Congress to bind this Court. To the contrary, Congress's express goals in passing the FSIA clearly evidence an implied will that runs directly contrary to the Executive's position in this case. Lacking any defensible constitutional or Congressional grant of authority for its extreme position, the Executive relies on a slew of inapposite cases concerning distinct immunities not even claimed by Defendant. The law is clear, however, that the Executive Branch's views regarding conduct immunity for foreign government officials are not binding on courts.

Although the SOI is not binding on this Court, it is nevertheless entitled to due consideration to the extent that it presents the Executive's reasoned view regarding the perceived foreign policy consequences of this specific case. This Court should apply its own independent judgment, however, and find that the Executive's view is not reasonable

and should not be followed. In fact, the Executive does not even articulate a view as to the purported foreign policy consequences of this case, so there literally is no view to which the Court could defer. Instead, the SOI consists entirely of legal argument which is entitled to even less weight by this Court.

In any event, many reasons demonstrate the unreasonableness of the Executive's position. The SOI runs counter to established Ninth Circuit law, which strongly indicates that the Ninth Circuit will adopt the Fourth Circuit's rule in *Yousuf v. Samantar* denying immunity for *jus cogens* violations, which can never be official acts of state. In fact, this is the position taken by the only in-circuit district court to consider the split between the Fourth and Second Circuits on this issue. The numerous acts of Congress imposing criminal and civil penalties for torture and extrajudicial killing further tip the scales against the Executive's position, which would render the TVPA a dead letter in contravention of Congress's clear intent to impose liability for torture wherever it occurs. The fact that Defendant voluntarily entered the United States at the time this action commenced also supports the Court's exercise of jurisdiction in this case.

The Executive nevertheless seeks to shut the courthouse doors and prevent this Court from ever considering the merits of Plaintiffs' case. The power to deny jurisdiction and leave Plaintiffs with no recourse for the torture and killing of their son belongs only to the Court, however, and is one it should refrain from exercising here. This Court should reject the Executive's unreasonable view. Defendant is not immune.

## II.    ARGUMENT

### A.    The Executive's Attempt to Bind this Court Offends the Separation of Powers

The Executive's attempt to steamroll this Court by insisting that its SOI receive absolute deference offends the separation of powers and should be rejected. At bottom, the Executive's argument constitutes an attempt at unlawful "lawmaking" unsupported by any constitutional or Congressional grant of power. As the Supreme Court has repeatedly emphasized, lawmaking is generally a legislative rather than an executive function. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U. S. 579, 587 (1952) ("In the framework

of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker."); *Medellin v. Texas*, 552 U.S. 491, 527-28 (2008) ("As Madison explained in The Federalist No. 47, under our constitutional system of checks and balances, '[t]he magistrate in whom the whole executive power resides cannot of himself make a law.'" (quoting J. Cooke ed., p.326 (1961))). Ignoring these authorities, the Executive seeks to claim for itself the exceptional power to determine the law and the facts governing the instant application of immunity, to establish the policy governing future cases, and to render these determinations unreviewable. This position is contrary to law.

The exercise of such extraordinary power requires a source arising from either the Constitution or an act of Congress. *Medellin*, 552 U.S. at 524 ("The President's authority to act, as with the exercise of any governmental power, 'must stem either from an act of Congress or from the Constitution itself.'" (quoting *Youngstown*, 343 U. S. at 587)). No source for this power exists, however. The Executive's claim of absolute power in the field of foreign official immunity[1] is unsupported by the Constitution and contrary to the will of Congress. Accordingly, it should be rejected.

### 1. The Constitution Does Not Provide the Executive Exclusive Authority Over Foreign Affairs

The Executive asserts that it may bind this Court due to its constitutional authority over foreign affairs. <u>SOI 6:10-18.</u> The Supreme Court has held otherwise. In *Zivotofsky v. Kerry*, the Supreme Court soundly rejected such an expansive view of the Executive's foreign relations power:

> The Secretary now urges the Court to define the executive power over foreign relations in even broader terms. He contends that under the Court's precedent the President has 'exclusive authority to conduct diplomatic relations,' along with 'the bulk of foreign-affairs powers.' In support of his submission that the President has broad, undefined powers over foreign affairs, the Secretary quotes *United States v. Curtiss-Wright Export Corp.*,

---

[1] Throughout this brief, Plaintiffs use the terms "foreign official" and "foreign official immunity" to refer to current and former foreign government officials (and the specific immunity governing them) who are neither sitting heads of state nor sitting diplomats or consular officials. *See infra* § II.A.3 (discussing the significance of this distinction).

which described the President as 'the sole organ of the federal government in the field of international relations.' This Court declines to acknowledge that unbounded power. . . . It is not for the President alone to determine the whole content of the Nation's foreign policy.

135 S.Ct. 2076, 2089-90 (2015) (citations omitted).

The Supreme Court has long recognized that the Executive Branch's constitutional authority over foreign affairs requires due consideration by courts of its reasonable views, but not blind abdication. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 733 n.21 (2004) (identifying "a policy of case-specific deference to the political branches" and stating that "federal courts should give serious weight to the Executive Branch's view of [a] case's impact on foreign policy"); *Republic of Aus. v. Altmann*, 541 U.S. 677, 702 (2004) (suggesting that, with respect to foreign sovereign immunity, "should the State Department choose to express its opinion on the implications of exercising jurisdiction over particular petitioners in connection with their alleged conduct, that opinion might well be entitled to deference as the considered judgment of the Executive on a particular question of foreign policy"); *El Al Isr. Airlines v. Tsui Yuan Tseng*, 525 U.S. 155, 168 (1999) ("Respect is ordinarily due the reasonable views of the Executive Branch concerning the meaning of an international treaty."); *see also Doe v. Exxon Mobil Corp.*, 473 F.3d 345, 357 (D.C. Cir. 2007) (Kavanaugh, J., dissenting) ("[T]he federal courts give deference to reasonable explanations by the Executive Branch that a civil lawsuit would adversely affect the foreign relations of the United States"); *Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254, 261-64 (2d Cir. 2007) (adopting a policy of case-specific deference to the political branches in matters implicating foreign affairs). As these authorities make clear, the Executive's general constitutional authority over foreign affairs does not provide a basis for requiring absolute deference to its view regarding Defendant's immunity in this case.

### 2. The Supreme Court Has Rejected Absolute Deference to the Executive's Views Over Foreign Affairs to Avoid Politicizing the Judiciary and Corrupting Its Decisions

In accordance with this view, in *First National City Bank v. Banco Nacional de*

1    *Cuba*, 406 U.S. 759 (1972), six Justices held that the Executive Branch's view on whether

2    a court should dismiss a case under the Act of State doctrine is not entitled to absolute

3    deference.[2]  *See id.* at 790 (Brennan, J., dissenting) ("As six members of this Court

4    recognize today, . . . the representations of the Department of State are entitled to weight

5    for the light they shed on the permutation and combination of factors underlying the act of

6    state doctrine. But they cannot be determinative."); *id.* at 773 & n.4 (1972) (Douglas, J.,

7    concurring) (stating that "unquestioning judicial deference to the Executive" would reduce

8    the Court to "a mere errand boy for the Executive Branch"); *id.* at 773 (Powell, J.,

9    concurring) ("I would be uncomfortable with a doctrine which would require the judiciary

10   to receive the Executive's permission before invoking its jurisdiction. Such a notion, in

11   the name of the doctrine of separation of powers, seems to me to conflict with that very

12   doctrine."). As Justice Brennan, joined by three other Justices, explained, "blind

13   adherence to [the Executive Branch's] requests . . . politicizes the judiciary." *Id.* at 790.

14   He noted that absolute deference would produce the additional problem of inconsistent

15   decisions because, under such an approach, "the fate of the individual claimant would be

16   subject to the political considerations of the Executive Branch. Since those considerations

17   change as surely as administrations change, similarly situated litigants would not be likely

18   to obtain even-handed treatment." *Id.* at 792.

19        The Supreme Court's treatment of the Executive Branch's views under the Act of

20   State doctrine is highly relevant to the foreign sovereign immunity context. The two

21   doctrines "have a common source in the case of *The Schooner Exchange*," share the same

22   "policy considerations," and are both "judicially created [doctrines] to effectuate general

23   notions of comity among nations and among the respective branches of the

24   Federal Government." *Id.* at 762. Moreover, the problems Justice Brennan warned would

25   result from absolute deference to the Executive's views in the Act of State context were

26   precisely the same problems Congress sought to cure by eliminating the State

27   Department's role in determining immunity for foreign states and their agencies or

---

[2] Although dicta in Justice Rehnquist's plurality opinion supports deference, this position attracted the votes of only three Justices and is not the holding of the Court. *Id.* at 768.

instrumentalities by passing the FSIA. *Republic of Aus.*, 541 U.S. at 690 (explaining that the Executive's role in issuing immunity decisions during the pre-FSIA era "thr[e]w immunity determinations into some disarray, as 'foreign nations often placed diplomatic pressure on the State Department,' and political considerations sometimes led the Department to file 'suggestions of immunity in cases where immunity would not have been'" otherwise available (quoting *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 487-88 (1983))); *Verlinden*, 461 U.S. at 488 (stating that during the pre-FSIA period, "the governing standards were neither clear nor uniformly applied"). The High Court's treatment of the Executive's views in the context of the Act of State doctrine thus further demonstrates the implausibility of the Government's argument here.

> **3.** **The Specific Constitutional Power to "receive ambassadors and other public ministers," and Not the More Limited General Power Over Foreign Affairs, Governs the Cases the Executive Cites As Examples of Absolute Judicial Deference**

The Executive's argument that absolute deference is required relies on inapposite authorities involving a specific constitutional provision governing distinct immunities not at issue in this case. Unsurprisingly, the Executive focuses on the section from the Supreme Court's decision in *Samantar v. Yousuf*, 560 U.S. 305, 311 (2010), recounting the common law "two-step procedure developed for resolving a foreign state's claim of sovereign immunity," SOI 2:15-3:3, while omitting the end of this sentence in which the Court explains that this procedure was "typically asserted on behalf of seized vessels." The *Samantar* Court explains that under the first step, a foreign diplomat could request a "suggestion of immunity" from the State Department. *Id.* The Court then cites two decisions, *Ex parte Republic of Peru*, 318 U.S. 578, 588 (1943), and *Republic of Mexico v. Hoffman*, 324 U.S. 30, 34 (1945), for the proposition that, under the second step, "[i]f the request was granted, the district court surrendered its jurisdiction." *Samantar*, 560 U.S. at 311. Citing *Heaney v. Government of Spain*, 445 F.2d 501, 504-053 (2d Cir. 1971), and *Waltier v. Thomson*, 189 F. Supp. 319 (S.D.N.Y. 1960), the Court then adds that,

"[a]lthough cases involving individual foreign officials as defendants were rare, the same two-step procedure was typically followed when a foreign official asserted immunity." *Samantar*, 560 U.S. at 312.

This passage and the authorities on which it relies do not indicate that the State Department's views on immunities governing foreign officials like Defendant Barak are entitled to conclusive effect. *Contra* <u>SOI 6:10-7:10.</u> This is because the "two-step procedure" discussed in *Samantar* refers only to specific status-based immunities governing three categories of defendants: (1) foreign states and their instrumentalities, (2) sitting heads of state, and (3) sitting diplomats. Defendant Barak, of course, is none of these. The Executive's views on the immunities governing defendants in these categories are entitled to absolute deference only because they arise from an enumerated constitutional power assigning the Executive the exclusive responsibility of recognizing foreign states, heads of state, and diplomats. Once recognized as such, the attendant status-based immunities automatically apply. This enumerated constitutional power, however, has no connection to the conduct-immunity applicable to former officials like Defendant in this case, which applies not as a result of his *status* but based only upon the nature of the *conduct* in which he engages. *See Yousuf v. Samantar*, 699 F.3d 763, 769, 773-74 (4th Cir. 2012) (discussing the difference between status-based and conduct-based immunities).

The Reception Clause, located in Article II, § 3, assigns to the Executive Branch the exclusive power to "receive Ambassadors and other public Ministers," which includes by implication the power to accredit diplomats and recognize foreign governments, their instrumentalities, and their heads of state. *Zivotofsky*, 132 S.Ct. at 2087 ("It is no longer questioned that the President does not merely perform the ceremony of receiving foreign ambassadors but also determines whether the United States should recognize or refuse to recognize a foreign government. . . . 'Political recognition is exclusively a function of the Executive.'"); *Yousuf*, 699 F.3d at 772 ("Like diplomatic immunity, head-of-state immunity involves 'a formal act of recognition,' that is 'a quintessentially executive

1   function' for which absolute deference is proper.").

2          The Reception Clause explains the three lines of cases cited by the Supreme Court

3   in *Samantar v. Yousuf*, and by the Executive in its SOI, in which courts deferred to the

4   State Department's views regarding the application of status-based immunities attendant

5   to this specific enumerated constitutional power. The first line of authorities consists of

6   admiralty cases involving the seizure of vessels owned by foreign governments. In *Ex*

7   *parte Republic of Peru*, 318 U.S. 578, 580, 589 (1943), for example, the Court accepted

8   the Executive's SOI and held a ship owned by the Peruvian government immune from

9   suit. Two years later, in *Republic of Mexico v. Hoffman*, 324 U.S. at 38, the Court denied

10  immunity to a seized ship owned but not in the possession or service of the Mexican

11  government, based upon the established policy of the State Department not to suggest

12  immunity in other *in rem* admiralty proceedings raising similar facts.

13         While the Executive cites *Samantar*, *Peru*, and *Hoffman*, for the proposition that

14  courts must *in all cases* submit to the State Department's views (whether stated in an SOI,

15  or where no SOI is issued as embodied in its policy regarding immunity in other similar

16  cases), SOI 2:15-3:3; 3:20-24, there simply is no basis for applying the law of foreign-

17  owned ships to the law of foreign officials.[3]  First, the admiralty cases have been

18  abrogated by the FSIA, which eliminated the common law procedure for foreign states

19  and their agencies and instrumentalities. More important, the immunity of ships bears no

20  relation to the immunity of foreign officials because the law regards the former as

21  "instrumentalities" of the foreign state which owns them. 28 U.S.C. §§ 1605(b), 1609

22  (FSIA recognizes government-owned ships as instrumentalities of the foreign sovereign);

23  *Chuidian v. Philippine Nat'l Bank*, 912 F.2d 1095, 1101 (9th Cir. 1990) (FSIA principles

24  _____

25  [3] The Executive cites several other admiralty cases applying the same rule. SOI 3:23-4:2
    & n.2. *See Spacil v. Crowe*, 489 F.2d 614, 616-17 (5th Cir. 1974) (accepting SOI with
26  regard to Cuban-owned vessel); *S.E. Leasing Corp. v. Stern Dragger Belogorsk*, 493 F.2d
    1223 (1st Cir. 1974) (Per Curiam) (accepting SOI with regard to Soviet-owned vessel);
    *Isbrandtsen Tankers v. President of India*, 446 F.2d 1198, 1201 (2d Cir. 1971) (accepting
27  SOI with regard to Indian-owned vessel); *Rich v. Naviera Vacuba S. A.*, 295 F.2d 24, 26
    (4th Cir. 1961) (accepting SOI with regard to Cuban-owned vessel). These cases establish
28  the law of immunity for government-owned ships but are silent as to the law of immunity
    for foreign government officials.

1  existed at common law prior to FSIA's enactment in 1976). As a result, the Reception

2  Clause assigns the power to direct immunity for foreign-owned ships to the Executive as a

3  corollary to its power to recognize foreign governments. *See* U.S. Const. Art. II, § 3; *see*

4  *also Libya Velidor v. L/P/G Benghazi*, 653 F.2d 812, 814-15 (3d Cir. 1981) ("The FSIA

5  renders ships owned by foreign governments immune from arrest, and any arrest must be

6  lifted immediately upon ascertaining the sovereign ownership of a vessel.").[4]

7  The second line of cases on which the Executive relies involves foreign diplomats

8  and is equally unsupportive of its position. <u>SOI 5:15-22.</u> The Executive asserts that

9  *Heaney v. Government of Spain*, 445 F.2d 501, 504-05 (2d Cir. 1971), and *Waltier v.*

10  *Thomson*, 189 F. Supp. 319, 320-21 (S.D.N.Y. 1960)—each cited by the *Samantar*

11  Court—vindicate its position because these are examples of courts deferring to Executive

12  Branch immunity suggestions in cases "involve[ing] consular officials who had only

13  conduct-immunity for acts carried out in their official capacity."  <u>SOI 5:15-22.</u> Not so.

14  Like the admiralty cases, the consular cases have been superseded by acts of Congress and

15  are now governed by treaty. *See* Vienna Convention on Consular Relations arts.

16  43(1), 53(4), 71(1), Apr. 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261 (governing immunities

17  for consular officials); *see also* Vienna Convention on Diplomatic Relations art. 31,

18  Apr. 18, 1961, 23 U.S.T. 3227, 500 U.N.T.S. 95 (governing immunities for diplomats).

19  And like the admiralty cases, the Executive's power to render binding determinations on

20  whether foreign officials are entitled to the "special immunities" enjoyed by diplomats

21  and consular officials flows directly from the Executive's power to recognize the

22  diplomatic status of these individuals pursuant to its Article II, § 3 power to "receive

23  Ambassadors and other public Ministers." U.S. Const. Art. II, § 3; *Samantar*, 560 U.S.

24  312 & n.6.

---

25

26  [4] In fact, the practice of judicial deference is not consistent even with regard to cases involving seized ships. In *Berizzi Bros. Co. v. The Pesaro*, 271 U.S. 562 (1926), the

27  Supreme Court held that the steamship *Pesaro*, which was owned and operated by the Italian government, was entitled to immunity *even though the State Department explicitly*

28  *stated its view that the Pesaro was not entitled to immunity*. *Yousuf*, 699 F.3d at 770-71. The Supreme Court has never overruled *Berizzi*, which directly contradicts the Executive's argument that pre-FSIA courts always deferred to Executive Branch SOIs.

The Executive finally cites a third line of cases involving immunity for sitting heads of state. SOI 3:4-19. *See Habyarimana v. Kagame*, 696 F.3d 1029, 1030-31 (10th Cir. 2012) (accepting State Department's SOI for sitting head of state); *Ye v. Zemin*, 383 F.3d 620, 623-27 (2004) (same). "Like diplomatic immunity, head-of-state immunity involves 'a formal act of recognition,' that is 'a quintessentially executive function' for which absolute deference is proper." *Yousuf*, 699 F.3d at 772. Because the head of state cases implicate the Executive's Article II, § 3 power to recognize the status of a head of state, they are inapposite here. Defendant Barak was not a head of state when he commanded the IDF's attack on the *Mavi Marmara*. Any immunity he enjoyed arose not from whether or not he held a specific position in the government, but rather from whether his specific conduct was something the Israeli government could lawfully authorize. *See Yousuf*, 699 F.3d at 769, 774 (discussing the distinction between status-based and conduct immunities).[5]

As the foregoing discussion makes clear, the Reception Clause governing the admiralty, diplomat, and head of state cases has no bearing on the issue of immunity for a foreign official like Defendant. Moreover, no other specific constitutional basis exists which would empower the Executive to dictate the terms of Defendant's immunity in this case. Consequently, the scope of the Executive's authority in this action and thus the level of deference to which its SOI is entitled are controlled only by the Constitution's assignment of the general foreign affairs power, which is more limited than the Reception Clause because it is not an area over which the Executive enjoys exclusive authority. *Compare Zivotofsky*, 135 S.Ct. at 2087 (Executive has exclusive power over formal acts of recognition), *with id.* at 2089-90 (Executive lacks exclusive power over general matters of foreign affairs).

---

[5] Another factor weighing against absolute deference in conduct-immunity cases is the fact that the Executive lacks institutional competence even to decide whether immunity applies. Conduct immunity determinations turn on such matters as the formal organization of the foreign government (i.e., whether a defendant was a government employee) and the foreign official's scope of employment (i.e., whether the alleged misconduct a private act), which are not matters over which the Executive may claim any unique expertise.

Nor is deference to the Executive justified on functional grounds. In *Peru*, the Court justified its practice of deferring to the Executive in maritime cases because of the need for the judicial and political branches to speak with one voice, less the former "embarrass the latter by assuming an antagonistic jurisdiction." 318 U.S. at 588. Such an approach is well taken in situations involving the formal recognition of governments and their instrumentalities. *Zivotofsky*, 135 S.Ct. at 2079 ("Put simply, the Nation must have a single policy regarding which governments are legitimate in the eyes of the United States and which are not."). However, this approach has far less relevance to immunity determinations for foreign government officials: the Executive's recognition of a foreign government or its head of state does not contradict the judiciary's determination that another official of that government may be sued in a U.S. court. *Contra* <u>SOI 8:1-9.</u> Accordingly, any resulting embarrassment from the exercise of jurisdiction is insufficient to justify absolute deference. *See First Nat'l City Bank*, 406 U.S. at 765, 790 (noting "that juridical review of [official] acts . . . of a foreign power could embarrass the conduct of foreign relations by the political branches" as the basis of the Act of State doctrine, but rejecting absolute deference to the Executive's views in those cases).

### 4. The Ninth Circuit Has Never Granted Absolute Deference to the Executive Branch's Views Regarding Foreign Official Immunity

The Ninth Circuit has *never* treated the Executive Branch's views on foreign official immunity with absolute deference. *Contra* <u>SOI 4:3-15.</u> The Executive's attempt to mislead this Court by misrepresenting Ninth Circuit authorities is improper. *Cf Berger v. United States*, 295 U.S. 78, 88 (1935) (the interest of the DOJ "is not that it shall win a case, but that justice shall be done.").

None of the Ninth Circuit authorities the Executive cites involve the issue of judicial deference to the Executive and none concern the application of common law immunity for foreign government officials. Rather, each of these cases was decided under the FSIA as a matter of statutory interpretation. *See Peterson v. Islamic Republic of Iran*, 627 F.3d 1117 (9th Cir. 2010) (holding Iran immune under the FSIA); *Siderman de Blake*

*v. Republic of Argentina*, 965 F.2d 699 (9th Cir. 1992) (holding Argentina immune under the FSIA); *Chuidian v. Philippine Nat'l Bank*, 912 F.2d 1095 (holding foreign official immune under the FSIA). Statements of the Executive's views filed in *Chuidian* and *Siderman* were not the basis for those decisions. *Id.* at 705-06 ("With the enactment of the FSIA in 1976, Congress replaced the regime of deference to Executive suggestion with a comprehensive legislative framework[.]"). The Executive also cites a district court case, *Hassen v. Nahyan*, No. CV 09-01106 DMG (MANx), 2010 U.S. Dist. LEXIS 144819, at *13 (C.D. Cal. Sep. 17, 2010), for its inapposite holding in which the court recognized the immunity of a sitting head of state.

The Executive's citation to *Hassen* is especially mystifying because another aspect of the court's holding directly contradicts the Executive's position. Citing *Samantar*'s description of the "two-step procedure," the *Hassen* court considered and rejected immunity for Sheikh Mohamed, a former major with the UAE Air Force alleged to have tortured the plaintiff while acting "under actual or apparent authority or color of law of the government of the UAE." *Id.* at *7-11, 14-16.[6]  This holding directly contradicts the Executive's position, and supports Plaintiffs,' because it demonstrates that the court did not deem itself bound by the Executive's policy of suggesting immunity for the acts of government officials undertaken in their official capacity.[7]

### 5.    The Ninth Circuit Consistently Rejects Absolute Deference to the Executive's Views Over Foreign Policy Matters

While the issue of the level of deference due the State Department's SOI for a foreign government official remains an issue of first impression in this Circuit, there is no

---

[6] It is inconsequential that the *Hassen* plaintiff alleged that the defendants acted "under color of law" but not in their capacities as government officials. *Id.* at 10, 16. The law is clear that "under color of law" and "official capacity" are synonymous. *See* Pls. Opp MTD 12 n.9 (citing *United States v. Belfast*, 611 F.3d 783, 809 (11th Cir. 2010), S. Exec. Rep. 101-30 at 14, and *Yousuf*, 699 F.3d at 777).

[7]  *Hassen* undercuts the Executive's argument notwithstanding the fact that the State Department did not issue an SOI for Sheikh Mohammad. *Id.* at 16. The Executive and Defendant both maintain that courts are equally bound by the State Department's SOIs in cases in which they are issued *and* by the Department's established policies in cases in which they are not. SOI 2:21-26; Def't's MTD 9:23-10:4, 14:7-8; Def't's Reply ISO MTD 1:2-6 (Docket No. 44).

reason to believe that the Executive's position will be accepted. This is because courts within the Ninth Circuit have consistently declined to grant absolute deference to the foreign policy views of the Executive Branch, irrespective of the specific doctrine under which they are considered. *See Sarei v. Rio Tinto*, 487 F.3d 1193, 1204 (9th Cir. 2007), *vacated on other grounds*, 550 F.3d 822 (9th Cir. 2008) (declining to defer to the State Department's statement of interest that the lawsuit risked adverse impact to U.S. foreign relations, and holding that claims against a multinational corporation doing business in Papua New Guinea were not barred by the political question doctrine); *Alperin v. Vatican Bank*, 410 F.3d 532, 556-57 (9th Cir. 2005) ("Had the State Department expressed a view [on the case's impact on U.S.-Vatican relations], that fact would certainly weigh in evaluating [whether to assert jurisdiction]"); *Mujica v. Airscan*, 771 F.3d 580, 610 (9th Cir. 2014) (holding that the State Department's statement of interest that the litigation was adverse to U.S.-Colombian relations is entitled to "serious weight" under the international comity doctrine); *see also Doe I v. Liu Qi*, 349 F. Supp. 2d 1258, 1296 (N.D. Cal. 2004) ("[T]he views of the State Department, while not 'conclusive,' are entitled to respectful consideration [under the Act of State doctrine].").

These authorities reveal a longstanding and consistent practice of considering the Executive's views on the foreign relations impact of a lawsuit, but denying them conclusive weight. There simply is no reason to conclude that the situation would be any different here. When presented with the question, the Ninth Circuit will deny an SOI for a foreign government official conclusive effect, just as it has done in other foreign policy contexts and as the Fourth Circuit has recently done with regard to this very issue. *See Yousuf*, 699 F.3d at 772-73 (holding that Executive Branch SOIs for foreign government officials who are neither heads of state nor diplomats are not binding, and instead receive "substantial weight").

### 6.    The Specific SOI In This Case Is Entitled to Little Weight

In fact, the Executive's SOI should receive even less deference than in the cases cited above because, amazingly, the DOJ's brief *is entirely silent on the foreign policy*

1   *implications of this case.* The closest the Executive ever comes to revealing its view

2   consists of a single line in the State Department's letter to the DOJ, which is appended to

3   the SOI (Docket No. 48-1), urging immunity "considering the overall impact of this

4   matter on the foreign policy of the United States." The State Department never explains

5   *what* it believes that impact to be, however, let alone why. Does the Executive believe that

6   the litigation of this case will impair the U.S.'s relations with Israel? That it will have

7   other consequences for U.S. foreign policy? The Executive does not say. Accordingly,

8   this Court should not grant *any level of deference* to the Executive's views on the foreign

9   policy implications of this litigation because the Executive never bothers to share its views

10  on this topic. Perhaps the Executive's position that it may dictate terms to this Court leads

11  it to believe that it need not bother providing any reasons.

12      Instead of discussing its views on the foreign policy implications of this case, the

13  Executive's SOI consists entirely of legal argument on its views regarding the contours of

14  foreign sovereign immunity, an analysis of the TVPA, and the level of deference its views

15  should receive. Although they are surely staffed by highly skilled lawyers, the State

16  Department and DOJ have no special competence in the area of legal analysis, which is a

17  power the Constitution assigns not to the Executive but to the courts. *Marbury v. Madison*,

18  5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of the judicial

19  department to say what the law is."); *see also Doe I v. Liu Qi*, 349 F. Supp. 2d 1258, 1298

20  n.27 (N.D. Cal. 2004) ("Deference is due to the State Department on issues involving

21  political, rather than legal judgments[.]"). Moreover, portions of the Executive's legal

22  analysis directly contradict its prior statements in other cases raising identical issues.[8]

23  _____

24  [8] For example, although the Executive now disclaims the Reception Clause as the basis for
    its authority, *see* SOI at 6:10-18, it has repeatedly invoked this provision in the recent past

25  to support its demands for absolute deference. *See Yousuf v. Samantar*, Statement of
    Interest at 5-6, No. 1:04 CV 1360 (LMB) (E.D. Va. Feb. 14, 2011); *Giraldo v. Drummond

26  Co.*, Statement of Interest at 3, No. 1:10-mc-00764-JDB (D.D.C. Mar. 31, 2011) (each
    stating, in identical sentences, that "the Executive Branch continues to play the primary

27  role in determining the immunity of foreign officials as an aspect of the President's
    responsibility for the conduct of foreign relations *and recognition of foreign

28  governments*." (emphasis added)). In addition, the Executive's assertion here that
    immunity is required because "the acts of the official representatives of the state are those
    of the state itself, when exercised within the scope of their delegated powers," SOI 6:18-

1  Such inconsistencies provide yet another reason for declining to give the Executive's

2  present opinions much weight. *See In re Estate of Marcos Human Rights Litig.*, 978 F.2d

3  493, 500 (9th Cir. 1992) ("We do not read the executive branch's flip on this issue as

4  signifying so much; its change of position in different cases and by different

5  administrations is not a definitive statement by which we are bound[.]").

6  **B.     Under *Youngstown*, the Executive Has Only Limited Power Over Foreign**

7  **         Official Immunity**

8           When confronted with questions regarding the scope of Executive Branch power,

9  the Supreme Court has in recent years repeatedly turned to Justice Jackson's familiar

10 tripartite framework from *Youngstown Sheet & Tube v. Sawyer*, 343 U.S. at 635-38 (1952)

11 (concurring opinion). *See*, *e.g.*, *Zivotofsky*, 132 S.Ct. 2076 (2015); *Medellin*, 552 U.S. 491,

12 524-32 (2008). This framework divides exercises of Executive Branch power into three

13 categories. First, when "the President acts pursuant to an express or implied authorization

14 of Congress, his authority is at its maximum, for it includes all that he possesses in his

15 own right plus all that Congress can delegate." *Id.* at 635. Second, "in absence of either a

16 congressional grant or denial of authority" there is a "zone of twilight in which he and

17 Congress may have concurrent authority," and where "congressional inertia, indifference

18 or quiescence may" invite the exercise of executive power. *Id.* at 637. And third, when

19 "the President takes measures incompatible with the expressed or implied will of

20 Congress . . . he can rely only upon his own constitutional powers minus any

21 constitutional powers of Congress over the matter."  *Id.* Here, the Executive's authority

22 over the question of Defendant's immunity falls within the third (and weakest) category.

23 Taken together with the limits on the Executive's constitutional authority, it is clear that

24

25 7:1, contradicts its statement in a prior case that "if the defendant were correct that color
   of law can simply be equated with sovereignty . . . , the torture statute would be rendered
26 meaningless. Such a result must be rejected." U.S.'s Response in Opposition to
   Defendant's Motion to Dismiss the Indictment, *United States v. Emmanuel*, No. 06-
27 20758-CR (S.D. Fla. July 5, 2007), at *1. In *Emmanuel*, which involved the prosecution of
   Roy Belfast Jr. (a/k/a "Chuckie" Taylor) for torture in Liberia, the Court agreed with the
28 U.S. government that the defendant could both act "in an official capacity" and still be
   held personally responsible for his conduct by a U.S. court.

PLTFS' SUPPL BRIEF RE U.S. GOV'T'S                    -15-
SUGGESTION OF IMMUNITY

the Executive lacks the exceptional power of stripping the Court of jurisdiction to adjudicate Plaintiffs' claims in this case. *See Medellin*, 552 U.S. at 524.

### 1. Immunity Determinations For Foreign Officials Do Not Fall within *Youngstown* Category I

There is no possibility that this case falls within the first *Youngstown* category, where the Executive's power is at its greatest. This dooms the Executive's attempt to claim for itself the broadest possible power—to bind the court with its own unreviewable determination as to the facts and the law in this case.

The law is clear that there exists no express authorization of Congress. *Youngstown*, 343 U.S. at 635. *See Samantar*, 560 U.S. at 325 (holding that foreign official immunity is governed by the common law, not any act of Congress). Nor is there any implied congressional authorization. In enacting the FSIA, Congress did nothing to advance or even facilitate the Executive's power to determine questions of sovereign immunity. To the contrary, the statute was specifically designed to *eliminate* the Executive's role from most determinations of immunity and move such decisions to the courts. *Republic of Aus.*, 541 U.S. at 691; *Verlinden*, 461 U.S. at 488. In the absence of any express or implied authorization by Congress, there can be no question but that foreign official immunity determinations do not fall into the first *Youngstown* category where the Executive's authority is at its greatest. Because the Executive seeks to exercise absolute power, this alone provides sufficient ground to deny its SOI conclusive effect.

### 2. Immunity Determinations For Foreign Officials Do Not Fall within *Youngstown* Category II

Nor is there an established pattern of Congressional acquiescence to the Executive's policy regarding conduct immunity sufficient to place this case within the second *Youngstown* category. *Youngstown*, 343 U.S. at 637. During the pre-FSIA era, there were very few cases even raising the issue of immunity for individual foreign government officials. The rare cases involving immunity for lower-level foreign officials, moreover, yielded inconsistent results. *Samantar*, 560 U.S. at 323; *Yousuf*, 699 F.3d at 772. Among

the 110 foreign sovereign immunity decisions decided by the State Department between the issuance of the Tate letter in 1952 and enactment of the FSIA in 1976, only six related to the immunity of foreign officials, and two of those were inapposite cases involving head of state immunity. *Samantar*, 130 S.Ct. at 2291 n.18.

The Executive argues that *Samantar*'s citation to *Greenspan v. Crosbie*, 74 Civ. 4734 (GLG), 1976 U.S. Dist. LEXIS 12155 (S.D.N.Y. Nov. 23, 1976), demonstrates that the Supreme Court recognized an historical practice of deference in conduct immunity cases. SOI 5:22-27. In *Greenspan*, the State Department issued a suggestion of immunity and the court held defendants immune. *Id.* The *Samantar* Court did not cite *Greenspan* for its deference to the State Department's SOI, however, but only for the fact that an SOI was issued. *See* 560 U.S. at 321-22 ("[H]istorically, the Government sometimes suggested immunity under the common law for individual officials even when the foreign state did not qualify."). *Greenspan* is thus a slender reed on which to support the notion that courts must afford all SOIs absolute deference. The Executive reads far too much into the *Samantar* Court's silence on this issue; had the Court actually desired to direct lower courts to defer to the Executive Branch in conduct immunity cases, it easily could have said so. *Samantar*'s citation to *Greenspan* for a distinct proposition simply does not suggest otherwise. By the Executive's own logic, moreover, *Samantar*'s citation of *The Schooner Exchange*—widely regarded as the foundational foreign sovereign immunity case—would refute the argument that the Court was endorsing any pre-FSIA practice of deference because in that case, the Court did not treat the Executive's views as binding but rather conducted its own detailed analysis of the governing international law doctrines. *Id.* at 311, 312 n.6 (citing *The Schooner Exchange v. McFaddon*, 11 U.S. 116, 117-19 (1812)).

In any event, pre-FSIA cases such as *Greenspan* are not controlling here because the common law has not remained frozen in time since 1976, but has evolved considerably since. Specifically, the past 40 years have seen the maturation of international human rights law and the universal acceptance of non-derogable *jus cogens* norms disavowed as

1    official actions by all Nations. As a result, the *jus cogens* exception to foreign official

2    immunity, *see Yousuf*, 699 F.3d at 777, raises a new question regarding the level of

3    deference an Executive Branch SOI should receive when the Executive fails to recognize

4    this exception, as it did in *Yousuf* and as it does now here.

5          The common law continues to evolve for the additional reason that, while few pre-

6    FSIA cases involved foreign official immunity, *see Samantar*, 560 U.S. at 323; *Yousuf*,

7    699 F.3d at 772, the issue arises far more frequently during the post-FSIA era because the

8    practice of naming individual foreign officials as defendants has become far more

9    common. This is in large part due to the fact that since 1976, Congress passed several new

10   statutes providing for individual liability for human rights violations, *see* Torture Victims

11   Protection Act of 1991; Anti-Terrorism Act, 28 U.S.C. § 1605A(c) (2008), and courts

12   revived an older statute for this purpose, *see* Alien Tort Statute of 1789; *Filártiga v. Peña-*

13   *Irala*, 630 F.2d 876, 878 (2d Cir. 1980). These statutes provide for individual liability for

14   human rights violations perpetrated under color of law, an area highly likely to implicate

15   foreign relations. The post-FSIA cases do not establish a pattern of Congressional

16   acquiescence to the courts' treatment of foreign official immunity because the outcome of

17   these cases has been mixed. [9]

18         Because there is no clear pattern of Congressional acquiescence to the State

19

20   [9] *Compare Yousuf*, 699 F.3d 763 (declining to grant absolute deference to SOI and
     denying conduct immunity), *and Warfaa v. Ali*, 811 F.3d 653, 2016 U.S. App. LEXIS
21   1670 (4th Cir. Feb. 1, 2016) (Unpub. Disp.) (denying conduct immunity), *and Hassen v.*
     *Nahyan*, No. CV 09-01106 DMG (MANx), 2010 U.S. Dist. LEXIS 144819 (C.D. Cal.
22   Sep. 17, 2010) (same), and *Republic of Philippines by Central Bank of Philippines v.*
     *Marcos*, 65 F.Supp.793, 797-98 (N.D. Cal. 1987) (rejecting the State Department's
23   suggestion of head-of-state immunity), *with Matar v. Dichter*, 563 F.3d 9 (2d Cir. 2009)
     (deferring to SOI and granting immunity) *and Rosenberg v. Pasha*, 577 F. App'x 22, 23–
24   24 (2d Cir. 2014) (same), *and Doe v. De Leon*, 555 F. App'x 84, 85 (2d Cir. 2014) (same);
     *and Giraldo v. Drummond Co.*, 493 F. App'x 106 (D.C. Cir. 2012) (per curiam) (same);
25   *cf. Mireskandari v. Mayne*, No. 12- cv-3861-JGB-MRWx, 2016 U.S. Dist. LEXIS 38944,
     *50-61 (C.D. Cal. Mar. 23, 2016) (adopting reasoning of *Yousuf* but granting conduct
26   immunity because no *jus cogens* violations were alleged). As noted, because the
     Executive and Defendant each assert that courts are equally bound by the State
27   Department's views on immunity regardless of whether it issues an SOI or not, cases in
     which courts declined to follow the State Department's policy are equally probative of the
28   issue of Congressional acquiescence to any judicial deference to the State Department's
     views.

1    Department's policy regarding foreign official immunity, the Executive lacks any implied

2    grant of authority by Congress. Accordingly, the Executive's power over foreign official

3    immunity does not fall within the second *Youngstown* category.

### 3.    Conduct Immunity Determinations Fall within *Youngstown* Category III

5         Not only is the Executive unable to rely on any implied grant of authority by

6    Congress, its position is *contrary* to Congress's implied will in passing the FSIA. This

7    places the Executive's SOI into the third *Youngstown* category, where its power is at its

8    most limited.

9         As the Supreme Court has recognized, during the pre-FSIA period, the Executive's

10   role in issuing SOIs in status immunity cases to which courts generally deferred "thr[e]w

11   immunity determinations into some disarray, as 'foreign nations often placed diplomatic

12   pressure on the State Department,' and political considerations sometimes led the State

13   Department to file 'suggestions of immunity in cases where immunity would not have

14   been'" otherwise available. *Republic of Aus.*, 541 U.S. at 690 (quoting *Verlinden*, 461

15   U.S. at 487-88). Even the State Department acknowledged problems arising from its role

16   in determining immunity during this period, stating that it lacked the capacity to provide

17   due process and render reasoned decisions in accordance with governing legal principles.

18   *To Define the Jurisdiction of U.S. Courts in Suits Against Foreign States: Hearing on*

19   *H.R. 11315 Before the Subcomm. on Admin. Law & Governmental Relations of the H.*

20   *Comm. on the Judiciary*, 94th Cong. 34 (1976) (statement of Monroe Leigh, Legal

21   Adviser, Department of State) ("[W]e in the Department of State and Legal Advisor's

22   Office do not have the means of really conducting a quasi-judicial hearing to determine

23   whether, as a matter of international law, immunity should be granted in a given case.").

24   As a result of these problems, "the governing standards [for sovereign immunity

25   determinations] were neither clear nor uniformly applied." *Verlinden*, 461 U.S. at 488.

26        Recognizing the dysfunction resulting from its role in immunity determinations, the

27   State Department itself recommended that Congress pass the FSIA, and "sought and

28   supported the elimination of its role with respect to claims against foreign states and their

agencies or instrumentalities." *Samantar*, 560 U.S. at 323 n.19. Congress obliged, passing the FSIA in direct response to these problems. In so doing, Congress sought "to free the Government from the case-by-case diplomatic pressures, to clarify the governing standards, and to '[assure] litigants that . . . decisions are made on purely legal grounds and under procedures that insure due process,'" *Verlinden*, 461 U.S. at 488 (quoting H. R. Rep. No. 94-1487, p. 7 (1976) (first alteration in original)). These goals were accomplished by "transfer[ing] primary responsibility for immunity determinations from the Executive to the Judicial Branch," *Republic of Aus.*, 541 U.S. at 691, and providing a "comprehensive set of legal standards governing claims of immunity in every civil action against a foreign state or its political subdivisions, agencies, or instrumentalities," *Verlinden*, 461 U.S. at 488. Even though the FSIA does not apply to individuals, the fact that almost no pre-FSIA cases involved official immunity, *Yousuf*, 699 F.3d at 772; *Samantar*, 130 S.Ct. at 2291 n.18, renders Congress's general intent to remove the Executive from immunity determinations unmistakable.

Defying this clear legislative history, the rule the Executive now urges would directly contradict Congress's intent to eliminate, or at the very least to greatly minimize, the State Department's role in immunity determinations by forcing a return to the very abuses Congress passed the FSIA to eradicate. The instant case perfectly illustrates the pitfalls of this approach, in which the State Department, in response to the lobbying efforts of an American ally, is demanding that this Court relinquish its jurisdiction based upon an erroneous analysis of common law immunity which the Executive seeks to place beyond the power of any court to review. *See Spacil v. Crowe*, 489 F.2d 614, 620-21 (5th Cir. 1974) (holding in an admiralty case that "the executive's decision to recognize and allow a claim of foreign sovereign immunity" "binds the judiciary" and forecloses any review of the executive's action).

To be sure, the simple act of denying determinative effect to the Executive's SOIs would not remove the Executive from the process altogether, because the State Department could continue issuing SOIs which courts would consider, even if they did not

deem themselves bound. *See Samantar*, 560 U.S. at 323. But locating final decision-making authority in the courts would avoid the evils Congress sought to avoid, specifically the politicization of the immunity determination process and the danger of inconsistent decisions.[10] Because the Executive's position is contrary to the implied will of Congress in passing the FSIA, its SOI falls within the third *Youngstown* category where the Executive's power is weakest. This fact compels the conclusion that the Executive lacks the authority to require that its SOI receive absolute deference. Accordingly, while the Court should consider the SOI in this case, it should exercise its independent judgment and reject it an unreasonable.

**C.  Because the Executive's Suggestion of Immunity for the Torture and Execution of Furkan Doğan Is Not Reasonable, this Court Should Reject It**

The Executive's view that Defendant be shielded from this Court's jurisdiction is unreasonable and not entitled to deference. This is true for many reasons.

First, as set forth in Plaintiffs' Opposition to Defendant's Motion to Dismiss, the Ninth Circuit routinely denies immunity for *jus cogens* violations such as those committed in this case. *See Trajano v. Marcos*, 978 F.2d 493 (9th Cir. 1992); *Hilao v. Marcos (In re Estate of Marcos, Human Rights Litig.)*, 25 F.3d 1467 (9th Cir. 1994); *see also Liu Qi*, 349 F. Supp. 2d 1258 (each denying immunity for *jus cogens* violations). Plfs Opp MTD 5:6-6:16 (Docket No. 37).[11] The Executive and Defendant each attempt to distinguish *Trajano* by claiming that the Philippine government waived the defendant's immunity, *see*

---

[10] For example, courts could choose not to defer to overly politicized SOIs treating a defendant differently than other similarly situated parties on the ground that the SOI does not present a reasoned view.  Even without the inevitable politicization of the Executive's SOI process, the simple fact that two decision-makers would be involved in cases involving both a state and individual official as defendants could lead to inconsistent adjudications in a single case.  For example, the Executive's proposed rule would permit a court and the State Department to reach conflicting determinations as to whether an agency is an instrumentality of a foreign state, a fact relevant to the court's decision regarding the agency's immunity under the FSIA and to the Executive's analysis of whether the official the agency employs is entitled to immunity as a government employee.  Ingrid Wuerth, *Foreign Official Immunity Determinations in U.S. Courts*, 51 VA. J. INT'L L. 915, 945-48 (2011).

[11] Rather than reiterate their prior arguments in full, Plaintiffs refer the Court to arguments previously raised in their Opposition to Defendant's Motion to Dismiss and incorporate those arguments herein.

PLTFS' SUPPL BRIEF RE U.S. GOV'T'S                -21-
SUGGESTION OF IMMUNITY

SOI 4 n.3; MTD 13 n.4 (Docket No.25), but each misapprehends that case. The *Trajano* court did *not* decide the case based on waiver. *See* 25 F.3d at 1472 n.7 ("The plaintiffs argue that these submissions constitute a waiver of sovereign immunity under FSIA by the Republic of the Philippines, and that Marcos' derivative immunity is thus also waived. . . . It is unnecessary to reach this issue, in view of the conclusion that FSIA does not immunize the illegal conduct of government officials."). Moreover, although these cases were decided prior to the Supreme Court's decision in *Samantar*, numerous reasons indicate that the Ninth Circuit would reach the same conclusion under the common law. *See* Plfs Opp MTD 6:17-7:17.

Second, this Court should follow the better view taken by the Fourth Circuit in *Yousuf v. Samantar*, rather than the thinly reasoned and wrongly decided Second Circuit decision in *Matar v. Dichter*, 563 F.3d 9 (2d Cir. 2009), and hold that Defendant is not immune for his *jus cogens* violations.[12] *See Yousuf*, 699 F.3d at 776; Plfs Opp MTD 7:18-9:13. Importantly, the only district court in the Ninth Circuit to consider this circuit split decided, in an opinion published two days after Plaintiffs filed their Opposition brief, that the reasoning in *Yousuf* is "detailed and persuasive" and adopted its rule denying immunity for *jus cogens* violations. *Mireskandari*, 2016 U.S. Dist. LEXIS 38944, *50-51.

Denying Defendant immunity in this case is also consistent with the rule adopted by the *Restatement (Second) of Foreign Relations Law*, which was in effect at the time the FSIA was debated and enacted. Beth Stephens, *The Modern Common Law of Foreign Official Immunity*, 79 FORDHAM L. REV. 2669, 2677-78 (2011). Section 66(f) of the Restatement provides that conduct immunity applies only to an "official, or agent of the state with respect to acts performed in his official capacity *if the effect of exercising jurisdiction would be to enforce a rule of law against the state*." (Emphasis added.) The Restatement explains in a comment that "enforc[ing] a rule against a state" means situations such as those in which a foreign official seeks to enforce a contract by ordering

---

[12] Although the Executive insists that the Fourth Circuit's decision in *Yousuf* constitutes legal error, the Supreme Court ignored the Executive's recommendations and declined to grant certiorari. SOI 7 n.5.

payment from government funds. *Id.* cmt. B, illus. 2. Here, because Plaintiffs sue Defendant only in his individual capacity, and seek damages only from his own pocket, the exercise of jurisdiction will not have the effect of enforcing a rule of law against the State of Israel. The traditional understanding of conduct immunity, which has been adopted by courts within the Ninth Circuit, *see Hassen*, No. CV 09-01106 DMG (MANx), 2010 U.S. Dist. LEXIS 144819, at \*15, thus militates against the application of immunity in this case.

Other considerations further support the exercise of jurisdiction here. Defendant voluntarily entered the jurisdiction with the consent of the United States, and thus assented to the personal jurisdiction of its courts. *See The Schooner Exchange v. McFaddon*, 11 U.S. at 136 (discussing the extent of a nation's jurisdiction "within its own territory"). The importance of this principle in the context of foreign sovereign immunity is demonstrated by the fact that the FSIA, which "codif[ied] the existing common law principles of sovereign immunity," *Chuidian*, 912 F.2d at 1101, recognizes an exception to immunity for conduct occurring with the territory of the United States, *see* 28 U.S.C. § 1605(a)(5).

Moreover, Congress has repeatedly acted to impose civil and criminal penalties for the acts alleged here. *See* Torture Convention Implementation Act of 1994, 18 U.S.C. §§ 2340-2340A; War Crimes Act of 1996, 18 U.S.C. § 2441; Alien Tort Statute, 28 U.S.C. § 1350; Torture Victim Protection Act of 1991, 28 U.S.C. § 1350 note; Anti-Terrorism Act, 18 U.S.C. § 2333(a). These statutes articulate a clear political determination to hold perpetrators to account for such misconduct.

Finally, to the extent that the common law ever provided conduct-immunity for torture and extrajudicial killing, Congress abrogated such immunity when it passed the TVPA. *See* Plfs Opp MTD 9:14-13:2. The rule urged by the Executive and Defendant to grant foreign officials immunity for all acts performed in an official capacity would render the TVPA a dead letter because *jus cogens* violations such as torture can be committed only when they involve state action. Plfs Opp MTD 12:1-13:2. The Executive's argument

1   that foreign governments may simply waive the foreign official's immunity is

2   unpersuasive because the Executive fails to cite even a single case where such waiver has

3   actually occurred. SOI 12:3-11. As noted, *Trajano*—the one case the Executive cites—did

4   not actually involve waiver. 25 F.3d at 1472 n.7.

5       The Executive counters by citing the canon of statutory construction that statutes

6   abrogating the common law must do so expressly. SOI 10:17-11:10. However, this would

7   violate another cannon of statutory construction that Congress is presumed not to legislate

8   without purpose. *See Butz v. Economou*, 438 U.S. 478, 501 (1978) (common law

9   immunity principles cannot leave an act of Congress "drained of meaning"); *City of

10   Milwaukee v. Ill. & Mich.*, 451 U.S. 304, 314 (1981) ("[W]hen Congress addresses a

11   question previously governed by a decision rested on federal common law the need for

12   such an unusual exercise of lawmaking by federal courts disappears.").

13       By nullifying the TVPA, the rule urged by the Executive and Defendant would

14   frustrate the clear intent of Congress to help eradicate the twin scourges of torture and

15   extrajudicial killing by imposing liability wherever such acts occur. *See* Plfs. Opp. MTD

16   10:14-25. Because Congress' purpose behind the TVPA is clear, the canons relied on by

17   the Executive and Defendant must give way to a faithful interpretation of the TVPA based

18   on its natural meaning, which is to impose liability for acts of torture and extrajudicial

19   killing without exception. *See Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783 (1952)

20   ("Statutes which invade the common law . . . are to be read with a presumption favoring

21   the retention of long-established and familiar principles, *except when a statutory purpose

22   to the contrary is evident. No rule of construction precludes giving a natural meaning to

23   legislation like this that obviously is of a remedial, beneficial and amendatory character.

24   It should be interpreted so as to effect its purpose.*" (emphasis added)).

25       The Executive and Defendant each cite language in the TVPA's legislative history

26   suggesting that government officials would not be immune for torture because no

27   government would ratify their conduct. SOI 11:22-12:2; Reply ISO MTD 5:5-10 (each

28   citing S. Rep. No. 102-249, at 8 (1991)). But this does not mean that Congress believed

that any such ratification would be effective, and courts have held it would not. *See Liu Qi*, 349 F. Supp. 2d at 1286 ("[A]cts by an official which violate the official laws of his or her nation but which are authorized by covert unofficial policy of the state . . . are not immunized[.]"); *id.* at 1298 ("[A]n official obtains sovereign immunity . . . only if he or she acts under a *valid and constitutional* grant of authority." (emphasis added)). For all of these reasons, the SOI is unreasonable and should be rejected.[13]

### III.   CONCLUSION

For all of the foregoing reasons, this Court is not bound by the Executive's SOI. The Executive's view is unreasonable and should be rejected. Defendant is not immune.

Dated: July 11, 2016

Respectfully Submitted,
STOKE AND WHITE LLP
HADSELL STORMER & RENICK LLP

By: ___/s/ - Brian Olney___
Dan Stormer
Cindy Pánuco
Mary Tanagho Ross
Brian Olney
Haydee J. Dijkstal (*pro hac vice*)
Attorneys for Plaintiffs

---

[13] Any concern that denying Defendant immunity in this case would expose U.S. Government officials and military personnel stationed overseas to litigation may be addressed through the Government's use of multilateral and bilateral agreements providing for greater immunity than the common law requires. These may include Special Mission Immunity, *see* Hazel Fox, QC, Philippa Webb, *The Law of State Immunity*, OUP Oxford, p. 563 (Aug 29, 2013); Michael Wood, The IMMUNITY OF OFFICIAL VISITORS, Max Plank Yearbook of United Nations Law, Volume 16, p. 96 (2012) (*quoting Kilroy v. Windsor (Prince Charles, Prince of Wales)*, Civ. No. C-78-291 (N.D. Ohio, 1978); Washington D.C. International Law Institute (ed.), DIGEST OF THE UNITED STATES PRACTICE IN INTERNATIONAL LAW, 1978, 641; ILR 81 (1990), 605; Status-of-Force Agreements, *see* Dept. of State, Int'l Security Advisory Bd. ("ISAB"), *Report on Status of Forces Agreements* (Jan. 16, 2015), *available at* http://www.state.gov/documents/organization/236456.pdf (last visited Feb. 23, 2016); and other bilateral immunity agreements under Article 98 of the International Criminal Court, *see* Rome Statute of the International Criminal Court, Preamble, U.N. Doc.A/CONF.183/9 (1998).