O

# United States District Court
# Central District of California

AHMET DOGAN, individually and on behalf of FURKAN DOGAN; HIMET DOGAN, individually and on behalf of FURKAN DOGAN,

     Plaintiffs,

  v.

EHUD BARAK,

     Defendant.

Case № 2:15-cv-08130-ODW(GSJx)

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS [29]**

## I. INTRODUCTION

This case examines whether a federal court should adjudicate the lawfulness of an overseas military operation conducted by a United States ally.  Plaintiffs Ahmet Doğan and Himet Doğan allege that Defendant Ehud Barak, former Israeli Defense Minister and Prime Minister, violated federal law when he authorized Israeli military forces to board a vessel at sea and use lethal force against their son, Furkan Doğan, who is a United States citizen.  Barak now moves to dismiss this action based on the foreign official immunity doctrine, the political question doctrine, the act of state doctrine, and for failure to allege sufficient facts to state a claim.  The Court concludes that Plaintiffs' claims are barred by the foreign official immunity doctrine, and thus **GRANTS** Barak's Motion.  (ECF No. 29.)

## II.    FACTUAL BACKGROUND

### A.    The Israeli-Palestinian Conflict

The underlying incident in this case is part of the broader Israeli-Palestinian conflict that has embroiled the Middle East for the last half-century.  (*See* Compl. ¶ 15, ECF No. 1.)  In 1967, following the Six Day War, Israeli Defense Forces ("IDF") took control of an area known as the Gaza Strip.  (Egleson Decl., Ex. D ("Turkel Report") at 140, ECF No. 26.)[1]  Israel eventually entered into several peace accords with the Palestinian Authority, which resulted in Israel withdrawing both its military forces and civilian settlements from the Gaza Strip.  (*Id.* at 140–41.)  And while the accords gave Israel full control over the territorial waters adjoining the Gaza Strip, it is unclear whether this allowed Israel to prevent ships sailing under a foreign flag from entering Gaza.  (*Id.* at 146–47.)

Following Israel's withdrawal, a political party called Hamas came to power in Gaza through a combination of electoral success and force.  (*Id.* at 142, 144.)  Hamas immediately took an aggressive stance toward Israel, and thus hostilities between the IDF and Palestinian fighters increased dramatically.  (*Id.* at 142–45.)  On January 3, 2009, Israel established a full naval blockade of the Gaza Strip to stem the flow of weapons into Gaza and put pressure on Hamas.  (*See* Compl. ¶ 19; Egleson Decl., Ex. C ("Palmer Report") at 47–49.)

### B.    The Incident

On May 31, 2010, a flotilla of six vessels—including the *Mavi Marmara*—began sailing from Turkey toward the naval blockade.  (*Id.* ¶ 25.)  The Gaza Freedom Flotilla, as they called themselves, was intended to "draw international public attention to the situation in the Gaza Strip and the effect of the blockade, and to deliver humanitarian assistance and supplies to Gaza."  (*Id.* ¶¶ 24–25.)  Plaintiffs allege that the vessels were inspected before leaving Turkey, and were confirmed not

---

[1] All page cites are to the page numbers used by Barak rather than the internal page number of each individual document.

to be carrying any weapons.  (*Id.* ¶ 26.)  Israel learned of the intended flotilla mission in February 2010, and thereafter developed a plan to intercept the flotilla at sea before it reached the blockade.  (*Id.* ¶ 27.)  At the same time, several nations, including Israel, Greece, Turkey, the United States, the United Kingdom, Egypt, and Ireland, engaged in extensive diplomatic negotiations aimed at preventing the mission, although these efforts were unsuccessful.  (Palmer Report at 57–58.)

Many facts surrounding the incident are heavily disputed; nevertheless, the Court endeavors to briefly summarize it for the purposes of this motion.  When the flotilla was approximately sixty miles from the blockade, the Israeli navy sent four radio warnings to the vessels, stating that: (1) the flotilla was entering a restricted area; (2) all humanitarian assistance could be supplied to the Gaza Strip by land crossings; and (3) all legal measures would be taken to prevent the vessel from breaching the naval blockade.  (Turkel Report at 252–53; Palmer Report at 59.)  One vessel—the *Mavi Marmara*—repeatedly transmitted a fixed message stating that they intended to sail through the blockade and that the IDF did not have the legal right to stop them.  (Turkel Report at 253; Palmer Report at 59.)  At that point, the IDF decided to board all six vessels.  (Turkel Report at 255.)

The IDF's initial attempts to board the *Mavi Marmara* by speedboat were unsuccessful due to active resistance from those on board.  (*Id.* at 257–61; Palmer Report at 62–63.)  Thus, IDF soldiers began fast-roping onto the vessel from a helicopter.  (Turkel Report at 261.)  According to the Turkel Report and Palmer Report, the first soldiers to board the vessel were attacked with clubs, knives, axes, metal poles, and other make-shift weapons.  (*Id.* at 263–68; Palmer Report at 64–66.)  Additional IDF soldiers began boarding the ship, and were authorized to use lethal force against the passengers.  (Turkel Report at 278–79.)  There is conflicting information as to whether the flotilla passengers had or used firearms during the confrontation.

Ultimately, the IDF killed nine passengers, including Furkan Doğan, before

taking control of the *Mavi Marmara*.[2]   (Turkel Report at 304; Compl. ¶¶ 12, 37.) Doğan was filming the operation from the vessel's top-deck when he was shot four times from behind by the IDF.  (Compl. ¶ 39.)  A fifth shot struck Doğan's face at point-blank range, "likely while he was lying on the ground on his back."  (*Id.*; *see also* Palmer Report at 67.)

## C.   Barak's Involvement

At all times relevant to this lawsuit, Barak was the Israeli Defense Minister. (Compl. ¶ 28.)  Barak allegedly planned the operation to intercept the flotilla, directed the operation in real time, and personally authorized the IDF to board and take over the *Mavi Marmara*.  (*Id.* ¶¶ 28–34.)  It is unclear whether Barak authorized the use of lethal force, but regardless, Plaintiffs allege that Barak has ultimate command responsibility for Doğan's death.  (*Id.* ¶¶ 3, 28.)

## D.   International Response

The incident sparked a diplomatic crisis, with many nations issuing statements harshly condemning Israel's actions.[3]   Relations between Turkey and Israel soured; Turkey immediately recalled its ambassador from Israel and cancelled joint military exercises with Israel, and ultimately expelled Israel's ambassador after Israel refused to apologize for the incident.[4]   Turkey also opened a criminal investigation into the incident, and eventually indicted four Israeli military personnel who participated in the raid.[5]

Reactions within the United States government were mixed.  The United States

---

[2] An additional passenger died four years later from the injuries he suffered during the incident.

[3]   *National reactions to the Gaza flotilla raid*, Wikipedia.org, https://en.wikipedia.org/wiki/National_reactions _to_the_Gaza_flotilla_raid (last accessed Oct. 3, 2016); *Israel attack on gaza aid ship: US 'deeply regrets' loss of life*, The Telegraph (May 31, 2010), http://www.telegraph.co.uk/news/worldnews/middleeast/palestinianauthority/7790151/Israel-attack-on-gaza-aid-ship-US-deeply-regrets-loss-of-life.html.

[4]   *Mavi Marmara: Why did Israel stop the Gaza Flotilla?*, BBC News (June 27, 2016), http://www.bbc.com/news/10203726.

[5]   *Turkish Court Charges Senior IDF Officials Over Gaza Flotilla Deaths*, Haaretz (May 28, 2012), http://www.haaretz.com/israel-news/turkish-court-charges-senior-idf-officials-over-gaza-flotilla-deaths-1.432983.

Senate passed a resolution expressing strong support for Israel's actions, S. Res. 548, 111th Cong. (2010), and the House of Representatives introduced a series of bills and resolutions conveying similar sentiments, H.R. 5501, 111th Cong. (2010); H.R. Res. 1440, 111th Cong. (2010); H.R. Res. 1532, 111th Cong. (2010). The Executive Branch, on the other hand, issued far more cautious and neutral statements that simply expressed "regret" at the loss of life.[6]  And while the United States resisted international efforts to pass a U.N. resolution condemning Israel's conduct and calling for an international investigation, it also pushed both Israel and Turkey to resolve their differences over the incident. President Barak Obama was personally involved in this effort, and eventually persuaded Israeli Prime Minister Benjamin Netanyahu to apologize to Turkish President Recep Tayyip Erdoğan.[7]

In June 2016, Israel and Turkey reach a formal resolution of the matter.[8]  Israel agreed to pay $20 million to a compensation fund for Turkish families, and Turkey agreed to end all criminal and civil claims against Israel and its military personnel. The agreement also provided for the eventual return of ambassadors to each other's country.  Both Secretary of State John Kerry and Vice President Joseph Biden were reportedly involved in facilitating this deal.[9]

**E.   Procedural History**

Plaintiffs filed this lawsuit on October 16, 2015.  (ECF No. 1.)  Plaintiffs assert eight causes of action, each of which falls under one of three federal statutes: (1) the Alien Tort Claims Act, 28 U.S.C. § 1350 ("ATCA"); (2) the Torture Victim Protection Act, 28 U.S.C. § 1350 note ("TVPA"); and (3) the Anti-Terrorism Act, 18 U.S.C.

---

[6] *Press Availability with Romanian Foreign Minister Teodor Baconschi After Their Meeting*, U.S. Department of State (June 1, 2010), http://www.state.gov/secretary/20092013clinton/rm/2010/06/142460.htm;

[7] *Mavi Marmara: Why did Israel stop the Gaza Flotilla?*, BBC News (June 27, 2016), http://www.bbc.com/news/10203726.

[8] *Israel, Turkey Strike Deal to Normalize Ties*, CNN.com (June 27, 2016), http://www.cnn.com/2016/06/26/middleeast/israel-turkey-relations/.

[9] *A Rare Foreign Policy Success for Team Obama*, New York Post (June 27, 2016), *available at* http://nypost.com/2016/06/27/a-rare-foreign-policy-success-for-team-obama/.

§ 2333 ("ATA").   Plaintiffs essentially allege that the killing of Furkan Doğan constitutes torture and an extra-judicial killing in violation of federal law and international law, for which Barak is personally responsible.  (*See generally* Compl. ¶¶ 28–54.)

In December 2015, the Israeli government requested that the U.S. Department of State file a Suggestion of Immunity on behalf of Barak.  (Egelson Decl., Ex. H.)  On January 20, 2016, Barak moved to dismiss Plaintiffs' Complaint.  (ECF No. 29.)  Plaintiffs timely opposed, and Barak timely replied.  (ECF Nos. 37–40, 44.)  On June 10, 2016, after concluding that Barak's actions were official government acts that "were authorized by Israel," the United States filed a Suggestion of Immunity with this Court.   (ECF No. 48.)   One month later, each party submitted supplemental briefing regarding the effect of the Suggestion of Immunity.   (ECF Nos. 49, 50.)  Barak's Motion is now before the Court for consideration.

## III.   LEGAL STANDARD

A party may move to dismiss an action for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).   The Ninth Circuit has not yet determined whether common law foreign official immunity is analyzed under Rule 12(b)(1) or Rule 12(b)(6).   However, because the doctrine implicates the Court's jurisdiction over the controversy, the Court concludes that it is subject to review under Rule 12(b)(1).   *See The Schooner Exch. v. McFaddon*, 11 U.S. (7 Cranch) 116, 146 (1812) ("[G]eneral statutory provisions [should not] be so construed as to give [the courts] jurisdiction in a case[] in which the sovereign power has impliedly consented to wave its jurisdiction."); *Rosenberg v. Pasha*, 577 F. App'x 22, 23 (2d Cir. 2014) (reviewing a dismissal based on common law foreign official immunity under Rule 12(b)(1)); *In re Terrorist Attacks on Sept. 11, 2001*, 122 F. Supp. 3d 181, 186 (S.D.N.Y. 2015) (dismissing action based on common law foreign official immunity under Rule 12(b)(1)); *Rishikof v. Mortada*, 70 F. Supp. 3d 8, 11 (D.D.C. 2014) (same).

"A Rule 12(b)(1) jurisdictional attack may be facial or factual."   *Safe Air for*

*Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction.  By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction."  *Id.*  "In resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment."  *Id.*  The court "need not presume the truthfulness of the plaintiffs' allegations," *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000), and may "resolve factual disputes concerning the existence of jurisdiction," *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988).  "Once the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction."  *Savage v. Glendale Union High Sch., Dist. No. 205, Maricopa Cnty.*, 343 F.3d 1036, 1040 (9th Cir. 2003).

## IV.   EXTRINSIC EVIDENCE

Both parties submit substantial extrinsic evidence in support of their Motion and Opposition.  Even though the Court may review evidence beyond the Complaint in a factual attack on jurisdiction,[10] each party still contends that certain documents submitted by the other are inadmissible.  The Court will briefly address these arguments here.

### A.   Barak's Documents

Plaintiffs argue that Exhibits G, I, J, K, and L are inadmissible in a Rule

---

[10] Plaintiffs also insist that Barak's Motion is a facial, not factual, attack on jurisdiction, and thus argue that the Court may consider extrinsic evidence only to the extent it is subject to judicial notice or incorporated by reference into the Complaint.  (Opp'n at 3–4.)  This argument simply begs the question; it is the introduction of extrinsic evidence that converts the motion into a factual attack.  *Savage*, 343 F.3d at 1040 n.2 (it is "the moving party [that] convert[s] the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court"); *Safe Air for Everyone*, 373 F.3d at 1039 (same).  Barak plainly does not rely on just the allegations in the Complaint to challenge jurisdiction, and thus the Motion is *ipso facto* a factual attack.

12(b)(1) factual attack.  (Pls.' Obj. at 11–13.)  Exhibit G is an amicus brief filed by the United States in a case before the Second Circuit, and the remaining exhibits are suggestions of immunity filed in various district courts.  Barak uses these documents to show the position that the Executive has previously taken on questions of foreign official immunity.  (Mot. at 13–14 & n.14.)  Plaintiffs object to these documents on the grounds that they are "inadmissible hearsay subject to no exception."  (Pls.' Obj. at 12–13.)  The Court finds it unnecessary to engage a metaphysical discussion about whether a brief by the United States describing its own litigation position technically constitutes hearsay.  It is sufficient to note that a court may judicially notice that a party made certain arguments in a court document, *see e.g.*, *Ellsworth v. Prison Health Servs., Inc.*, No. CV-11-8070-PCT-RCB, 2012 WL 1107754, at *2 (D. Ariz. Mar. 31, 2012), and thus obviously may consider such on any form of motion to dismiss.  *See* 21B Kenneth W. Graham, Jr., Fed. Prac. & Proc. Evid. § 5106.4 (2d ed.) ("Saying that a court cannot notice the truth of hearsay found in court files, however, only takes us so far.  If taken as a universal principal, it would mean that a court could not notice the truth of a fact even though the court record is a source of indisputable accuracy for that fact.").  Thus, the Court overrules Plaintiffs' objections.

## B.    Plaintiffs' Documents

Plaintiffs submit the following documents in support of their Opposition: (1) a declaration by Dr. John T. Chalcraft, who is a professor of history and politics at the London School of Economics, and who (a) attests that this case involves legal, not political questions, and (b) attests to what did and did not happen on the *Mavi Marmara* (ECF No. 39-1); (2) a declaration by Dean Erwin Chemerinsky, who is a constitutional law professor and Dean of the University of California, Irvine School of Law, and who attests to the application of the political question doctrine in this case (ECF No. 39-2); and (3) a list of passengers aboard the *Mavi Marmara* (ECF No. 39-3).

Barak objects to the declarations submitted by Dr. Chalcraft and Dean

Chemerinsky as improper expert testimony on a question of law.  (Reply at 7 n.9.)  It is well-settled that experts may not opine on questions of law.  *See, e.g.*, *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008); *United States v. Scholl*, 166 F.3d 964, 973 (9th Cir. 1999).  Dean Chemerinsky's declaration is solely legal argument concerning the application of the political question doctrine to this case, and is therefore inadmissible.[11]  Similarly, Dr. Chalcraft's declaration contains substantial argument regarding the "structure of governance in the United States," and the fact that the question presented here is legal in nature and not political.  (*See generally* Chalcraft Decl. ¶¶ 9–14.)  This too is inadmissible.

Dr. Chalcraft also disputes Barak's characterization of the incident aboard the *Mavi Marmara*.  (*See generally id.* ¶¶ 6–33.)  Dr. Chalcraft relies mainly on a report by the United Nations Human Rights Council to rebut Barak's factual descriptions. This constitutes hearsay, Fed. R. Evid. 802, and violates the Best Evidence Rule, Fed. R. Evid. 1002.  And while the Court concludes that Dr. Chalcraft's testimony regarding the effect of the incident on Middle East policy and diplomatic relationships is admissible (*see generally id.* ¶¶ 35–44), the Court finds the testimony to be of little assistance or value in adjudicating this Motion.

## V.    DISCUSSION

Barak moves to dismiss Plaintiffs' claims based on common law foreign official immunity, the political question doctrine, and the act of state doctrine.  (Mot. at 8–18.) The gist of these defenses is that Barak cannot be sued in federal court for public acts he performed on behalf of a sovereign nation.  (*Id.*)  Barak also argues that Plaintiffs have not alleged sufficient facts to state a cause of action under the ATCA, the TVPA, or the ATA.  (Mot. at 18–22.)  The Court concludes that the foreign official immunity doctrine requires the dismissal of this action, and thus declines to address Barak's remaining arguments.

---

[11]  Moreover, the Court does not reach the political question doctrine here and thus the declaration is irrelevant.

**A.      History and Analytical Framework**

Common law foreign official immunity has its origins in *The Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116 (1812).  There, the Supreme Court adopted the long-standing and universally-accepted principle that ministers and instrumentalities of a friendly foreign sovereign are exempt from the jurisdiction of another nation.  *Id.* at 145–46.  Although *Schooner Exchange* concerned only the seizure of a French warship in the United States, "that opinion came to be regarded as extending virtually absolute immunity to foreign sovereigns" for all acts performed in their governmental (as opposed to commercial) capacity.  *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 486 (1983); *cf. Underhill v. Hernandez*, 168 U.S. 250, 252 (1897) (granting immunity to Venezuelan military commanders for torts committed against a United States citizen in Venezuela).[12]

The policy underlying foreign sovereign immunity is two-fold: the recognition that "[e]very sovereign state is bound to respect the independence of every other sovereign state," *Underhill*, 168 U.S. at 252; *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 703–04 (1976) (noting the "risk of affronting [a nation's] sovereignty" by "attempt[ing] to pass on the legality of their governmental acts"), and that "our national interest will be better served in such cases if the wrongs to suitors, involving our relations with a friendly foreign power, are righted through diplomatic negotiations rather than by the compulsions of judicial proceedings."  *Ex parte Republic of Peru*, 318 U.S. 578, 589 (1943); *Republic of Mexico v. Hoffman*, 324 U.S. 30, 34–35 (1945) ("Every judicial action exercising or relinquishing jurisdiction over the vessel of a foreign government has its effect upon our relations with that government."); *cf. Underhill*, 168 U.S. at 252 ("[T]he courts of one country will not sit in judgment on the acts of the government of another, done within its own

---

[12] Although *Underhill* is considered part of the line of cases concerning the act of state doctrine, both foreign official immunity and the act of state doctrine have a common origin in *Schooner Exchange*.  (Pls.' Supp. Br. at 5–6 (citing *First Nat. City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 762 (1972).)

territory.  Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves.").

Moreover, because matters concerning the acts and instrumentalities of foreign sovereigns typically involve "questions of policy [rather] than of law" and thus "are for diplomatic[] rather than legal discussion," *Schooner Exchange*, 11 U.S. (7 Cranch) at 146, a practice developed whereby the foreign sovereign would request immunity from the Executive and the Executive would recommend that the court either grant or deny immunity.  *Republic of Austria v. Altmann*, 541 U.S. 677, 688–89 (2004).  Because of the Executive's dominant role in the area of foreign policy, and the concomitant need to avoid embarrassing or antagonizing the Executive in its conduct of foreign affairs, courts have "consistently . . . deferred to the decisions of the political branches—in particular, those of the Executive Branch—on whether to take jurisdiction over [such] actions." *Verlinden B.V.*, 461 U.S. at 486; *United States v. Lee*, 106 U.S. 196, 209 (1882) ("In such cases the judicial department of this government follows the action of the political branch, and will not embarrass the latter by assuming an antagonistic jurisdiction."); *Hoffman*, 324 U.S. at 34 (holding that a court's jurisdiction "will be surrendered on recognition, allowance and certification of the asserted immunity by the political branch of the government charged with the conduct of foreign affairs"); *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 705 (9th Cir. 1992) (noting that "in the . . . 140 years [following *Schooner Exchange*], . . . the courts practiced consistent deference to the Executive Branch" on the issue of immunity).

Accordingly, courts today use "a two-step procedure developed for resolving a foreign state's claim of sovereign immunity." *Samantar v. Yousuf*, 560 U.S. 305, 311 (2010).  First, the foreign state can ask the State Department to make a "suggestion of immunity" to the court.  *Id.*  If the State Department makes such a suggestion, the court should defer to that suggestion and dismiss the case.  *Id.*; *see also, e.g.*, *Hoffman*, 324 U.S. at 35–36 ("It is . . . not for the courts to deny an immunity which

our government has seen fit to allow, or to allow an immunity on new grounds which the government has not seen fit to recognize. . . . [I]t is an accepted rule of substantive law governing the exercise of the jurisdiction of the courts that they accept and follow the executive determination [of immunity]."   (citations and footnote omitted)); *Republic of Peru*, 318 U.S. at 588 ("[T]he judicial seizure of the vessel of a friendly foreign state is so serious a challenge to its dignity, and may so affect our friendly relations with it, that courts are required to accept and follow the executive determination that the vessel is immune."); *The Navemar*, 303 U.S. 68, 74 (1938) ("If the claim is recognized and allowed by the Executive Branch of the government, it is then the duty of the courts to release the vessel upon appropriate suggestion by the Attorney General of the United States, or other officer acting under his direction."); *Samantar*, 560 U.S. at 311 (same); *Altmann*, 541 U.S. at 689 (same); *Verlinden B.V.*, 461 U.S. at 486 (same); *The Pesaro*, 255 U.S. 216, 219 (1921) (same).[13]

"'[I]n the absence of recognition of the immunity by the Department of State,' a district court 'ha[s] authority to decide for itself whether all the requisites for such immunity existed.'"  *Samantar*, 560 U.S. at 311 (quoting *Republic of Peru*, 318 U.S. at 587).  "In such a case the court will inquire whether the ground of immunity is one which it is the established policy of the [D]epartment [of State] to recognize." *Hoffman*, 324 U.S. at 36.  "Although cases involving individual foreign officials as defendants were rare, the same two-step procedure was typically followed when a foreign official asserted immunity."  *Samantar*, 560 U.S. at 312 (citing *Heaney v. Gov't of Spain*, 445 F.2d 501, 504 (2d Cir. 1971); *Waltier v. Thomson*, 189 F. Supp. 319 (S.D.N.Y. 1960)); *see also Yousuf v. Samantar*, 699 F.3d 763, 775 (4th Cir. 2012)

---

[13] Plaintiffs cite *Berizzi Bros. Co. v. The Pesaro*, 271 U.S. 562 (1926), as an example where the Supreme Court granted immunity to the sovereign despite the Executive suggesting otherwise, *see The Pesaro*, 277 F. 473, 479 n.3 (S.D.N.Y. 1921).  However, *Berizzi Bros.* did not squarely address the issue of deference, and it is well-settled that cases do not constitute precedent on "[q]uestions which merely lurk in the record, [which were] neither brought to the attention of the court nor ruled upon."  *Webster v. Fall*, 266 U.S. 507, 511 (1925).  *See also Hoffman*, 324 U.S. at 39 (Frankfurter, J., concurring) (criticizing *Berizzi Bros.* on the issue of Executive deference).

("[A] foreign official may assert immunity for official acts performed within the scope of his duty.); *Matar v. Dichter*, 563 F.3d 9, 14 (2d Cir. 2009) (same).

Here, both the Executive Branch's determination of immunity and the Court's own independent examination of the immunity issue leads to the same result: Plaintiffs' lawsuit is barred.

**B.    Suggestion of Immunity**

The United States has recommended that the Court grant Barak immunity from suit because Plaintiffs' action is one that "expressly challenge[s] Barak's exercise of his official powers as an official of the Government of Israel." (ECF No. 48.)  To avoid "embarrass[ing] the [Executive Branch] by assuming an antagonistic jurisdiction," *Lee*, 106 U.S. at 209, and to afford the political branches the much-needed discretion to resolve the issue through diplomacy, the Court should follow the Executive's suggestion.

Plaintiffs make several arguments, constitutional and otherwise, as to why deference to the Suggestion of Immunity is inappropriate, none of which the Court finds persuasive or controlling.

**1.    Separation of Powers**

First, Plaintiffs argue that the Constitution does not give the Executive unbounded authority in the area of foreign relations, and thus absolute deference violates the separation of power between the Executive Branch and the Judicial Branch.  (Pls.' Suppl. Br. at 3–4.)  There is some persuasive force to this argument. *Cf. First Nat. City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 773 (1972) (Powell, J., concurring) (stating in a case concerning the act of state doctrine: "I would be uncomfortable with a doctrine which would require the judiciary to receive the Executive's permission before invoking its jurisdiction.  Such a notion, in the name of the doctrine of separation of powers, seems to me to conflict with that very doctrine."); *see also id.* (Douglas, J., concurring) (same).

Upon closer inspection, however, this argument misapprehends the basis of the

Judiciary's deference to the Executive.  The Judiciary does not defer to the Executive because of any perceived requirement that it *must*.  Rather, the Judiciary *chose* to adopt a policy of deference simply as a matter of logic and comity.  Lawsuits concerning a foreign nation's official acts and instrumentalities inevitably implicate our diplomatic relationship with that nation.  Thus, the Supreme Court concluded, "our national interest will be better served in such cases if the wrongs to suitors, involving our relations with a friendly foreign power, are righted through diplomatic negotiations rather than by the compulsions of judicial proceedings." *Republic of Peru*, 318 U.S. at 589.  This gives the Executive, as the branch of government charged with conducting foreign affairs, primary responsibility for resolving these disputes.  If the Judicial Branch nevertheless waded into these disputes uninvited, it would seriously hamper the Executive in both the discharge of that responsibility and its ability to maneuver more generally in the area of foreign relations.  *See In re Muir*, 254 U.S. 522, 532–33 (1921) ("The reasons underlying [deference to the Executive] are as applicable and cogent now as in the beginning, and are sufficiently indicated by observing that it makes for better international relations, conforms to diplomatic usage in other matters, accords to the Executive Department the respect rightly due to it, and tends to promote harmony of action and uniformity of decision.").

Against this backdrop, the Judiciary decided it wise to defer to the Executive's suggestion of which disputes are best resolved by the courts, and which should be left to the Executive.  *See, e.g.*, *Verlinden B.V.*, 461 U.S. at 486 ("[F]oreign sovereign immunity is a matter of grace and comity on the part of the United States, and not a restriction imposed by the Constitution.  Accordingly, this Court consistently has deferred to the decisions of the political branches—in particular, those of the Executive Branch—on whether to take jurisdiction over actions against foreign sovereigns and their instrumentalities."); *Lee*, 106 U.S. at 209 (reasoning that deference to the Executive's determination of immunity is necessary to avoid "embarrass[ing]" the Executive Branch, and because disputes involving foreign

1    sovereigns "might involve war or peace, [and thus] must be primarily dealt with by

2    those departments of the government which had the power to adjust them by

3    negotiation, or to enforce the rights of the citizen by war").  So even though deference

4    to the Executive may, in any one case, appear to violate the separation of powers, it

5    actually reflects a fully independent and voluntary decision by the Judicial Branch to

6    relinquish control over an issue that it believed the Executive Branch was in the best

7    position to resolve.  *Cf. Ricaud v. Am. Metal Co.*, 246 U.S. 304, 309 (1918) ("To

8    accept a ruling authority and to decide accordingly is not a surrender or abandonment

9    of jurisdiction but is an exercise of it.").

10        **2.    The Reception Clause**

11        Next, Plaintiffs argue that absolute deference is still inappropriate in this

12   particular case.  Plaintiffs contend that Supreme Court cases affording absolute

13   deference to the Executive are ones that concern the Executive's exclusive

14   Constitutional power to "receive Ambassadors and other public Ministers."  U.S.

15   Const. art. II, § 3.  They argue that this case does not implicate the Reception Clause

16   because Barak is only a *former* Israeli official, and that the Executive's power here

17   arises from only the more general (and more limited) power over foreign affairs.  *See,*

18   *e.g.*, *Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2090 (2015) ("It is not for

19   the President alone to determine the whole content of the Nation's foreign policy."

20   (citations omitted)).  Plaintiffs therefore conclude that absolute deference is not

21   warranted here.

22        Plaintiffs' argument appears to be a post-hoc rationalization of Supreme Court

23   precedent.  Plaintiffs do not cite, and the Court cannot find, any Supreme Court cases

24   that invoke the Reception Clause as the basis for either the sovereign immunity

25   doctrine or the Judiciary's deference to the Executive on immunity determinations.

26   (Pls.' Suppl. Br. at 6–11.)  As previously noted, deference to the Executive was not

27   adopted as a matter of constitutional imperative; it was a judicially-created doctrine

28   based on comity and policy.  (*See supra* Section V.B.I.)  This is not to say

constitutional considerations never played a role in the development of Executive deference; to contrary, it seems undeniable that the latitude the Constitution affords the Executive Branch in the conduct of foreign policy helped shape the Court's decision to defer to the Executive's immunity determinations.  But the Reception Clause has never been the basis for any Supreme Court case affording absolute deference, and thus the fact that the Reception Clause is not implicated here means nothing.[14]

### 3.   Other Arguments

Plaintiffs make numerous other arguments that the Court finds unpersuasive.  Plaintiffs argue that the Ninth Circuit "has *never* treated the Executive Branch's views on foreign official immunity with absolute deference," and that the Ninth Circuit "consistently rejects absolute deference to the Executive's views over foreign policy matters." (Pls.' Suppl. Br. at 11–13.)  Given the number of times the Supreme Court *has* given absolute deference to the Executive on sovereign immunity questions, however, these arguments are non-starters.  Plaintiffs also perform an elaborate *Youngstown* analysis regarding the Executive's power over questions of foreign official immunity.  *See Youngstown Sheet & Tube Co. v. Sawyer (Steel Seizure)*, 343 U.S. 579, 634–38 (1952) (Jackson, J., concurring).  If the Court were deciding the issue on a blank slate, this analysis would certainly be relevant.  However, in light of the controlling precedent from the Supreme Court, that court is now the only one for which this analysis matters.

## C.   Independent Inquiry

Even if the Court conducted an independent inquiry on the immunity question, it would reach the same conclusion.  As previously noted, in the absence of a

---

[14] For the same reason, the Court also disagrees with the Fourth Circuit's analysis of this issue in *Yousuf v. Samantar*, 699 F.3d 763, 768 (4th Cir. 2012).  Like Plaintiffs here, *Yousuf* sweeps aside *Peru*, *Hoffman*, and the like on the basis that "there is no . . . constitutional basis suggesting that the views of the Executive Branch control questions of foreign official immunity." *Id.* at 773.  But as sovereign immunity and Executive deference was never a constitutional requirement to begin with, the Fourth Circuit's reasoning is unpersuasive.

suggestion of immunity, a court may conduct its own inquiry as to "whether the ground of immunity is one which it is the established policy of the [D]epartment [of State] to recognize." *Hoffman*, 324 U.S. at 36. "Prior to 1952, the State Department followed a general practice of requesting immunity in all actions against friendly sovereigns, but in that year the Department announced its adoption of the 'restrictive' theory of sovereign immunity." *Samantar*, 560 U.S. at 312 (citing *Verlinden B.V.*, 461 U.S. at 486–87). Under the restrictive theory, "immunity is confined to suits involving the foreign sovereign's public acts, and does not extend to cases arising out of a foreign state's strictly commercial acts." *Verlinden B.V.*, 461 U.S. at 487. Beyond this, however, "the governing standards [for immunity determinations are] neither clear nor uniformly applied," as case-by-case political considerations often influenced the Executive's immunity determinations. *Id.* at 478–88 & n.10.

Here, Barak's acts are irrefutably "official public acts" that entitle him to immunity. Barak, in his capacity as Israel's Minister of Defense, is accused of planning a sanctioned military operation whereby the IDF would intercept the Gaza Freedom Flotilla as it approached Israel's naval blockade. (Compl. ¶¶ 28–34.) Barak also allegedly directed the IDF to board the *Mavi Marmara*, and may have authorized the use of lethal force against those on board, including Furkan Doğan. (*Id.*) Israel has confirmed that Barak was authorized to take these actions in his capacity as Minister of Defense. (Egelson Decl., Ex. H.) Courts are near-uniform in granting immunity to foreign officials in such circumstances.[15] *Matar v. Dichter*, 500 F. Supp. 2d 284, 291 (S.D.N.Y. 2007) (granting immunity under FSIA for the Israel's Director of Security Services for planning the bombing of an apartment complex in Gaza), *aff'd*, 563 F.3d 9 (2d Cir. 2009); *Belhas v. Ya'Alon*, 466 F. Supp. 2d 127, 130 (D.D.C. 2006) (granting immunity under FSIA because "[i]t is clear from the complaint . . . that defendant is a retired Israeli military official who is being sued solely for actions

---

[15] Because the FSIA simply codified the restrictive theory of sovereign immunity, immunity decisions under the FSIA are relevant to a court's independent examination of common law foreign official immunity. *See Samantar*, 560 U.S. at 313.

taken in his official capacity"), *aff'd*, 515 F.3d 1279 (D.C. Cir. 2008); *Rosenberg v. Lashkar-e-Taiba*, 980 F. Supp. 2d 336, 338 (E.D.N.Y. 2013) (granting common law sovereign immunity for former directors of Pakistan's intelligence services who, in their official capacities, allegedly aided terrorist groups that carried out the 2008 Mumbai terrorist attacks), *aff'd sub nom. Rosenberg v. Pasha*, 577 F. App'x 22 (2d Cir. 2014); *Wultz v. Bank of China Ltd.*, 32 F. Supp. 3d 486, 498 (S.D.N.Y. 2014) (granting common law foreign official immunity to a former Israeli national security officer regarding acts taken in his official capacity concerning a suicide bombing in Tel Aviv); *Moriah v. Bank of China Ltd.*, 107 F. Supp. 3d 272, 280 (S.D.N.Y. 2015) (same).[16]

Moreover, the diplomatic firestorm following this incident, and the precarious state of U.S.-Middle East relations, shows why this dispute should be resolved through diplomacy rather than in the courts. First, because both Turkey and Israel are allies of the United States, the Executive Branch has studiously avoided taking any official position on the legality or wisdom of the operation. If this Court passed judgment on the legality of the operation, it would likely affect our diplomatic relationship with Turkey, Israel, and the myriad other nations with strong feelings about who was right and who was wrong. Second, the prolonged diplomatic standoff between Turkey and Israel, as well as the manner in which the standoff was resolved, vivifies how these incidents are inextricably intertwined with politics, diplomacy, foreign policy, and even economics, and thus why their resolution is best left to the political branches of government. Turkey took aggressive diplomatic action against Israel following the incident, including withdrawing its ambassador from Israel, cancelling joint military exercises with Israel, and expelling Israel's ambassador from

---

[16] *In re Estate of Ferdinand E. Marcos Human Rights Litig.*, 978 F.2d 493 (9th Cir. 1992), is distinguishable because the foreign official was found to be "acting on her own authority, not the authority of the Republic of the Philippines." *Id.* at 498. A subsequent appeal in that same case, *In re Estate of Ferdinand Marcos, Human Rights Litig.*, 25 F.3d 1467, 1472 (9th Cir. 1994), is thus also distinguishable on that same basis, and is further distinguishable by the fact that the Philippine government agreed that suit against the foreign official should proceed.

Turkey.  It took the personal efforts of this country's President, Vice President, and Secretary of State to broker a resolution—which, notably, included the termination of all civil lawsuits and criminal prosecutions arising from the incident.[17]   Under these circumstances, the Court has no doubt that immunity is appropriate.

**D.    Exceptions to Foreign Official Immunity**

Plaintiffs argue, notwithstanding the foregoing, that foreign official immunity never applies to officials who commit torture and extra-judicial killings, as they allege Barak has.  Plaintiffs first contend that there is a common law exception to immunity for violations of *jus cogens* norms.  (Opp'n at 7–9.)   Plaintiffs also argue that the TVPA abrogated common law foreign official immunity.  (Opp'n at 9–13.)  The Court is not persuaded by either argument.

**1.    *Jus Cogens* Exception**

Plaintiffs argue that Barak's alleged actions violate *jus cogens* norms,[18] and that this Court should adopt the Fourth Circuit's conclusion that foreign official immunity does not shield a defendant from liability for such violations.  *See Yousuf v. Samantar*, 699 F.3d 763, 775 (4th Cir. 2012).  Both Barak and the United States, on the other hand, urge the Court to follow the Second Circuit's view that there is no *jus cogens* exception to foreign official immunity.  *Matar v. Dichter*, 563 F.3d 9, 15 (2d Cir. 2009).

The Court declines to adopt a *jus cogens* exception.  The Court certainly agrees in principle that immunity doctrines should not shield persons who violate *jus cogens* norms.  *Yousuf*, 699 F.3d at 775–77.  However, allowing such an exception would

---

[17] The deal was also perceived in some quarters as facilitating unrelated economic deals between the two nations, thus further demonstrating how deeply the incident and its resolution ties in to other non-legal issues.  *See Israel, Turkey Strike Deal to Normalize Ties*, CNN.com (June 27, 2016), http://www.cnn.com/2016/06/26/middleeast/israel-turkey-relations/.

[18] "A *jus cogens* norm, also known as a 'peremptory norm of general international law,' can be defined as 'a norm accepted and recognized by the international community of States as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character.'"  *Yousuf v. Samantar*, 699 F.3d 763, 775 (4th Cir. 2012).  Torture and summary executions are considered violations of *jus cogens* norms.  *Id.*

effectively eviscerate the immunity for *all* foreign officials.   The question whether there was actually a *jus cogens* violation is inextricably intertwined with the merits of the underlying claim; thus, having a *jus cogens* exception would merge the merits inquiry with the immunity inquiry.  *Belhas v. Ya'alon*, 515 F.3d 1279, 1292 (D.C. Cir. 2008) (Williams, J., concurring); *Giraldo v. Drummond Co.*, 808 F. Supp. 2d 247, 250 (D.D.C. 2011), *aff'd*, 493 F. App'x 106 (D.C. Cir. 2012).   This causes two problems. First, foreign official immunity is not just a defense to liability, but an immunity from suit—i.e., an immunity from trial and the attendant burdens of litigation.   *Matar*, 563 F.3d at 14.   If a court had to reach the merits to resolve the immunity question, "there w[ould] effectively be no immunity."  *Giraldo*, 808 F. Supp. 2d at 250.   This would be particularly problematic in lawsuits arising from military operations, as any death resulting from such operations could give rise to a plausible allegation that *jus cogens* norms were violated. *Cf. Filarsky v. Delia*, 132 S. Ct. 1657, 1666 (2012) (rejecting exceptions to qualified immunity in the § 1983 context because they would "create[] significant line-drawing problems. . . . An uncertain immunity is little better than no immunity at all.").   Second, merging the question of immunity with the merits also undermines the original purpose of foreign official immunity: to avoid affronting the sovereignty of a foreign nation by passing judgment on their official government acts, which would inevitably happen if courts had to reach the merits to resolve immunity.

Moreover, the Executive has made clear that it does not recognize a *jus cogens* exception to immunity.  (Suggestion of Immunity at 9–10, ECF No. 48 (a *jus cogens* exception "is not drawn from any determination made or principles articulated by the Executive Branch"); Decl. Egleson, Ex. G at 485 ("[T]he Executive does not recognize any exception to a foreign official's immunity for civil suits alleging *jus cogens* violations.").   Because the common law immunity inquiry centers on what conduct the *Executive* has seen fit to immunize, *Hoffman*, 324 U.S. at 36, courts are not free to carve out such an exception on their own.

Finally, even aside from all this, the fact that Israel officially claimed Barak's

actions as within the scope of his authority cuts strongly against Plaintiffs' assertion that *jus cogens* violations were committed at all. *Yousuf*, 699 F.3d at 776 ("[A]s a matter of international and domestic law, *jus cogens* violations are, by definition, acts that are not officially authorized by the Sovereign."); *Belhas*, 515 F.3d at 1293 (Williams, J., concurring) ("[W]e need not decide whether a clear violation of *jus cogens* would bar a finding that a defendant acted within the scope of his authority; any inroad that the nature of the conduct alleged here might make against the inference of such authority is amply offset by the letter of the Israeli ambassador confirming the view that [an Israeli General] acted within the scope of his authority."); *Siderman de Blake*, 965 F.2d at 717 ("[A]ll states believe [torture] is wrong, all that engage in torture deny it, and no state claims a sovereign right to torture."); *cf.* S. Rep. 102-249, at 8 n.15 (1992) ("It is precisely because no state officially condones torture or extrajudicial killings that . . . official sanctions of a state could not possibly include acts of torture.").

### 2. TVPA Abrogation

Plaintiffs further argue that the TVPA abrogated common law foreign official immunity. (Opp'n at 9–13.) The TVPA provides as follows:

> An individual who, under actual or apparent authority, or color of law, of any foreign nation—
> (1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual; or
> (2) subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death.

Torture Victim Protection Act of 1991, Pub. L. No. 102-256, § 2(a)(1)–(2), 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note).

Courts should generally "'proceed on the assumption that common-law principles of . . . immunity were incorporated into our judicial system and that they should not be abrogated absent clear legislative intent to do so.'" *Filarsky*, 132 S. Ct.

at 1665 (quoting *Pulliam v. Allen*, 466 U.S. 522, 529 (1984)) (brackets omitted). Thus, the Supreme Court generally reads statutes as retaining common-law immunities even where "the statute on its face admits of no immunities." *Malley v. Briggs*, 475 U.S. 335, 339 (1986) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 418 (1976)) (adopting common law immunities under 42 U.S.C. § 1983). Given the obvious parallel between immunity questions in the § 1983 context and immunity questions under the TVPA, the Court applies this analytical framework to the question at hand. *See* Opp'n at 13 & n.10; S. Rep. 102-249, at 8 (noting that "[c]ourts should look to principles of liability under U.S. civil rights laws, in particular section 1983 of title 42 of the United States Code, in construing" the TVPA); H.R. Rep. 102-367, at 5 (1991) (same).

The very nature of this inquiry—whether a statute that is textually silent as to common law immunities is nonetheless subject to those immunities—requires the Court to examine the TVPA's legislative history. *Nw. Forest Res. Council v. Glickman*, 82 F.3d 825, 834 (9th Cir. 1996) ("[O]ur approach to statutory interpretation is to look to legislative history only where we conclude the statutory language does not resolve an interpretive issue."). The House Report, Senate Report, and Senators in floor debates all recognized that the TVPA would run up against various sovereign immunity doctrines. S. Rep. 102-249, at 7–8 & n.15; H.R. Rep. 102-367, at 5; 138 Cong. Rec. S2667-04 (1992). Both the House and the Senate agreed that the TVPA did not abrogate immunities under the FSIA, and did not override immunities afforded to "foreign heads of state and other diplomats visiting the United States on official business." H.R. Rep. 102-367, at 5; *see also* S. Rep. 102-249, at 7; 138 Cong. Rec. S2667-04.[19] The House Report does not explicitly address the issue of immunity for former diplomats, but the Senate Report made clear that "these immunities [are not intended] to provide former officials with a defense to a

---

[19] Indeed, the United States is required under various international treaties, including the United Nations Convention on Special Missions and the Vienna Convention on Diplomatic Relations, to recognize such diplomatic immunities. S. Rep. 102-249, at 7–8.

lawsuit brought under this legislation." S. Rep. 102-249, at 8. The Senate Report also stated that "the committee does not intend the 'act of state' doctrine to provide a shield from lawsuit for former officials." *Id.*; *see also* 138 Cong. Rec. S2667-04.

Despite this language, the Court concludes that the TVPA did not abrogate common law foreign official immunity for former officials such as Barak. When the TVPA was passed, most circuits held that individual officials could claim immunity under the FSIA. *See Samantar*, 560 U.S. at 310 & n.4. Nonetheless, Congress reasoned that it could retain immunities under the FSIA yet also subject former officials to liability because immunity under the FSIA required the foreign state to "'admit some knowledge or authorization of relevant acts.'" S. Rep. 102-249, at 8 (quoting 28 U.S.C. 1603(b)). And "[b]ecause all states are officially opposed to torture and extrajudicial killing . . . the FSIA should normally provide no defense to an action taken under the TVPA against a former official." *Id.* The Senate Report adopted the same reasoning with respect to the act of state doctrine. *Id.* (noting that the doctrine would not shield former officials because "no state commits torture as a matter of public policy"); *id.* at 8 n.15 ("It is precisely because no state officially condones torture or extrajudicial killings that . . . official sanctions of a state could not possibly include acts of torture.").[20] Indeed, when asked whether the TVPA would "involve the judicial branch of Government in foreign affairs," Senator Arlen Specter, who drafted the TVPA, responded that he "d[id] not expect that [the TVPA] w[ould] entangle the judiciary in sensitive foreign policy matters" precisely because "[n]o nation officially supports or condones torture." 138 Cong. Rec. S2667-04.

Other considerations also weigh against construing the TVPA to abrogate

---

[20] *See also* 138 Cong. Rec. S2667-04 ("All foreign states are officially opposed to torture and extrajudicial killing. therefore, the FSIA would not normally provide a defense to an action under this Act. If an agency relationship with the foreign state can be proved, however, then the FSIA would operate to bar the suit."); *see also id.* ("[I]f any sovereign state acknowledges that it engaged in torture or extrajudicial killing as a matter of official policy, then the act of state doctrine might bar a suit under this act. I think that such a circumstance under which a foreign government would acknowledge violating the universal taboo against torture or extrajudicial torture would be unheard of, and, therefore I would not expect the act of state doctrine to bar suits under this act.").

1   common law foreign official immunity.  If immunity did not extend to officials whose

2   governments acknowledge that their acts were officially authorized, it would open a

3   Pandora's box of liability for foreign military officials.  As previously noted, any

4   military operation that results in injury or death could be characterized at the pleading

5   stage as torture or an extra-judicial killing.  Without common law foreign official

6   immunity, former military officials from other nations would find themselves subject

7   to TVPA lawsuits every time they visit the United States.  This, in turn, would

8   embroil the Judiciary in sensitive foreign policy matters.  It seems beyond cavil that

9   Congress did not intended this result, and that recognition by the sovereign of the

10  official's acts (thereby resulting in immunity for the official) was seen as the

11  mechanism that prevented this slippery slope.

12      Thus, the Court concludes that Congress did not intend to abrogate immunity

13  for former officials, at least where the sovereign state officially acknowledges and

14  embraces the official's acts.  That is the case here: Israel sent a letter to the State

15  Department acknowledging that Barak's actions "were performed exclusively in his

16  official capacity as Israel's Minister of Defense," and that this lawsuit concerns only

17  "authorized military action taken by the State of Israel."  (Egelson Decl., Ex. H.)

18      This does not render the TVPA a "virtual nullity," as Plaintiffs contend.  (Opp'n

19  at 12–13.)  Plaintiffs argue that "[b]ecause the TVPA requires state action, which the

20  statute defines as participation by an official acting 'under color of law,' granting

21  immunity on this basis nullifies the statute due to the very conduct it necessitates."

22  (*Id.* at 12.)  But the TVPA provides liability where the foreign official to acts "under

23  actual or *apparent* authority or under *color* of law of any foreign nation," § 2(a), 106

24  Stat. 73 (emphasis added), which encompasses officials whose acts, while technically

25  performed in an official capacity, are clearly not acknowledged or condoned by the

26  foreign sovereign.  *Cf. Screws v. United States*, 325 U.S. 91, 111 (1945) (noting that

27  the phrase "under 'color' of law means under '*pretense*' of law," and thus did not

28  "embrace only action which the State in fact authorized" (emphasis added)).  Indeed,

it seems Congress saw liability for former officials arising *only* in that situation, for it acknowledged that immunity would bar suit where the foreign sovereign recognized the acts in question.  And in any event, the Executive can take into account the nature of the alleged wrongdoing against the former official in deciding whether or not to issue a suggestion of immunity.

Plaintiffs also argue that immunizing Barak "would create the perverse incentive for states to immunize their officials for their most degraded acts simply by ratifying their misconduct." (Opp'n at 12–13.)  While there may be some truth to this, Congress apparently discounted this possibility in enacting the TVPA.  *See, e.g.*, S. Rep. 102-249, at 8 ("[A]ll states are officially opposed to torture and extrajudicial killing."); 138 Cong. Rec. S2667-04 ("[A] foreign government . . . acknowledg[ing] violating the universal taboo against torture or extrajudicial torture would be unheard of.").  It is not for the Court to contradict Congress' judgment in this respect.

## VI.   CONCLUSION

The resolution of this dispute belongs with the Executive Branch, not the Judicial Branch.  For this reason, the Court **GRANTS** Barak's Motion to Dismiss without leave to amend.  (ECF No. 29.)


**IT IS SO ORDERED.**


October 13, 2016

_____

**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**